[No. B091774. Second Dist., Div. Seven. Aug. 9, 1995.]

SOUTHERN CALIFORNIA EDISON COMPANY, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
ENERGY DEVELOPMENT AND CONSTRUCTION CORPORATION et
al., Real Parties in Interest.

## COUNSEL

Russell C. Swartz, Elizabeth M. Matthias Carlsmith, Ball, Wichman, Murray, Case & Ichiki, John R. McDonough, James Polish and Donn Dimichele for Petitioner.

No appearance for Respondent.

Hillyer & Irwin, Brown Smith, Evelyn R. Wiggins and Donald L. Cupit for Real Parties in Interest.

Peter Arth, Jr., Edward W. O'Neill and Ellen S. Levine as Amici Curiae on behalf of Real Parties in Interest.

## OPINION

**JOHNSON, J.**—Southern California Edison Company (SCE) has long-term contracts to purchase electricity generated by wind-powered turbines owned by Energy Development and Construction Corporation and San Gorgonio Farms, Inc. (referred to collectively as Energy Development). Each contract is divided into two "periods." During the 10-year "first period," Edison is required to pay a substantially higher price for the electricity than during the "second period." A dispute exists between the parties as to when the "first period" commences to run. The trial court agreed with Energy Development's interpretation of the contracts and granted summary adjudication of its cause of action for declaratory relief. Having no right of appeal from this ruling, SCE petitioned for a writ of mandate under Code of Civil Procedure section 437c, subdivision (*l*).[1] We issued an order to show cause. For the reasons set forth below we conclude the trial court erred in granting summary adjudication because triable issues of fact exist as to the meaning of the term "first period."

---

[1]All statutory references are to the Code of Civil Procedure unless otherwise stated.

## Facts and Proceedings Below

In 1984 and 1985, SCE entered into contracts to purchase electricity produced by wind-driven turbines owned and operated by Energy Development. The relevant provisions of those contracts are identical and are discussed in detail below. Each contract is divided into two "periods"—a "first period" of ten years and a "second period" covering the remainder of the contract. Due to subsequent developments in the price of energy, the rate for the "first period" of the contract is substantially higher than the rate for the "second period."

A dispute has arisen between the parties over when the "first period" of the contract begins. Energy Development contends each turbine has a separate 10-year "first period," which commences when that turbine begins generating electricity, or 5 years from the date of execution of the contract, whichever occurs first. SCE disputes this contention and contends the contract provides for only one "first period," which commences when the first wind turbine begins producing electricity. Under Energy Development's interpretation of the contract, a turbine which began operation on January 1, 1984, would have a "first period" of January 1, 1984, to December 31, 1993. A turbine which began operation on July 1, 1988, would have a "first period" of July 1, 1988, to June 30, 1998, and so on. Under SCE's interpretation of the contract, if the first turbine began operation on January 1, 1984, the 10-year "first period" for all turbines would run from January 1, 1984 to December 31, 1993 regardless of when the other turbines came on line.

As a result of its dispute with SCE over the meaning of the term "first period," Energy Development brought an action against SCE in the respondent superior court for declaratory relief, specific performance and breach of contract. Following discovery, Energy Development moved for summary adjudication of its declaratory relief cause of action. (§ 437c, subd. (f).) The trial court granted the motion. The court found the contract language was not ambiguous and was not reasonably susceptible to the interpretation urged by SCE that there is only one "first period" under the contract.

In this writ proceeding, SCE challenges the trial court's ruling on procedural and substantive grounds.

Procedurally, SCE contends the court's ruling violated the requirement a summary adjudication must completely dispose of a cause of action. (§ 437c, subd. (f)(1).) Here, the same contract terms at issue in the declaratory relief cause of action are also at issue in the breach of contract and specific performance causes of action, which were not subject to summary adjudication. SCE also contends the trial court's order failed to adequately specify

the reasons for the court's determination as required by section 437c, subdivision (g).

Substantively, SCE contends the trial court erred in concluding the terms of the contract were not ambiguous as to the commencement of the "first period" and in disregarding extrinsic evidence of the parties' actual understanding of that term.

We are informed the contract terms at issue in this case are used in at least 44 other contracts between California's major power companies and energy producers and the interpretation of those terms will have a substantial effect on the future development and cost of energy in California. Because of the public importance of the issues in this case, we set the matter for hearing on an alternative writ.

The issues having been fully briefed and argued, we conclude the trial court properly entertained the motion for summary adjudication on the declaratory relief cause of action but erred in granting the motion because there are triable issues of fact which must be resolved before the contract can be interpreted.

## DISCUSSION

I. *Summary Adjudication of a Cause of Action for Declaratory Relief Is Not Precluded Merely Because the Issues Subject to Declaratory Relief Are Present in Other Causes of Action.*

Initially, SCE argues the trial court lacked authority to grant Energy Development's motion for summary adjudication of its declaratory relief cause of action because the issue whether the contracts provide a separate "first period" for each wind turbine is raised not only in the declaratory relief cause of action but in the specific performance and breach of contract claims as well. This argument is based on a misunderstanding of the decision in *Hood v. Superior Court* (1995) 33 Cal.App.4th 319 [39 Cal.Rptr.2d 296].

In *Hood*, the plaintiff, UCA, brought an action against Hood for damages and injunctive relief alleging, among other things, Hood breached a noncompetition clause in a contract between the parties. Hood cross-complained seeking injunctive relief and damages for breach of contract and sundry torts arising from the termination of the contract. In the cross-complaint Hood disputed UCA's right to terminate the contract and contended UCA had fraudulently induced him to enter the contract by representing the noncompetition clause would not be enforced. UCA moved for summary adjudication with respect to Hood's cross-complaint. The trial court denied the

motion on the ground it would not completely dispose of any of the causes of action in Hood's cross-complaint, as required by section 437c, subdivision (f). UCA then amended its complaint to add a cause of action for declaratory relief. In its declaratory relief cause of action UCA sought determinations that Hood's activities violated the noncompetition clause of the contract, that as a result UCA was entitled to terminate the contract, and that it was within its rights in doing so. UCA then moved for summary adjudication on its declaratory relief cause of action. This time the motion was granted and Hood sought writ review in the Court of Appeal.

The Court of Appeal issued a writ of mandate directing the trial court to set aside its order granting UCA's motion for summary adjudication. The court noted the Legislature had amended the statutory provision authorizing summary adjudication of issues to provide "[a] motion for summary adjudication shall be granted only if it completely disposes of a cause of action . . . ." (§ 437c, subd. (f)(1).) The purpose of this amendment, the court stated, was to stop the practice of using summary adjudication to obtain piecemeal rulings on facts or issues which do not completely dispose of a cause of action. (*Hood* v. *Superior Court, supra,* 33 Cal.App.4th at p. 323.) It was clear to the court that what UCA had done was to pluck certain issues out of the existing complaint and cross-complaint and place them in a purported declaratory relief cause of action solely for the purpose of moving for summary adjudication on that cause of action and thereby making an end run around the restrictions of section 437c, subdivision (f). (33 Cal.App.4th at pp. 321, 324.)

In our view, *Hood* does not stand for the proposition the trial court cannot grant summary adjudication of a properly pled cause of action for declaratory relief merely because the controversy between the parties spills over into other causes of action. Rather, the plain lesson of *Hood* is that parties will not be allowed to misuse the declaratory relief cause of action in an attempt to subvert the requirement a summary adjudication must completely dispose of a cause of action.

In the case before us, Energy Development's cause of action for declaratory relief alleges a controversy exists between it and SCE over whether the contracts provide for a separate "first period" payment rate for each wind turbine as it comes on line or whether the contracts provide for one "first period" payment rate which took effect when the first wind turbine came on line.

The interpretation of a contract is clearly a proper subject of declaratory relief. Section 1060 provides "[a]ny person interested . . . under a contract . . . may . . . bring an original action . . . in the superior court . . . for a

. . . determination of any question of construction or validity arising under the . . . contract." The fact the same issue of contract interpretation is also raised in other causes of action does not in itself bar declaratory relief or summary adjudication of that cause of action. Under section 1060, the plaintiff "may ask for a declaration of rights or duties, either alone or with other relief; and the court may make a binding declaration of these rights or duties, whether or not further relief is or could be claimed at the time." Furthermore, section 1062 provides the remedy of declaratory relief is "cumulative, and shall not be construed as restricting any remedy, provisional or otherwise, provided by law for the benefit of any party to such action, and no judgment under this chapter shall preclude any party from obtaining additional relief based upon the same facts."

Therefore, the construction of the contract terms at issue was properly before the trial court on Energy Development's motion for summary adjudication.

SCE also contends the trial court's order impliedly determined that the "First Period" for any turbine not in operation by the end of five years after execution of the contract would commence on that five-year anniversary date. SCE contends the trial court's order fails to state its reasons for this determination, as required by section 437c, subdivision (g). Because we vacate the trial court's order on other grounds we need not resolve this issue.

II. *The Contract Can Reasonably Be Interpreted to Mean the "First Period" Commenced When the First Wind Turbine Achieved Firm Operation.*

The dispute in this case is over the meaning of the term "first period" for purposes of determining the applicable payment rate for electricity generated by the wind turbines. Energy Development contends each turbine has its own "first period," which commences when that turbine achieves "firm operation" as defined in the contract, or five years after execution of the contract, whichever occurs first. SCE contends there is only one "first period" under the contract for purposes of determining the payment rate. That "first period" commences when the first wind turbine achieves "firm operation" and ends 10 years later. The trial court ruled the term "first period" was not ambiguous; that it applied to each turbine from the time it achieved "firm operation"; and the term was not reasonably susceptible to the meaning urged by SCE—that only one "first period" could occur under the contract. We disagree.

When a dispute arises over the meaning of contract language, the first question to be decided is whether the language is "reasonably susceptible" to the interpretation urged by the party. If it is not, the case is over.

(*Consolidated World Investments, Inc.* v. *Lido Preferred, Ltd.* (1992) 9 Cal.App.4th 373, 379 [11 Cal.Rptr.2d 524].) If the court decides the language is reasonably susceptible to the interpretation urged, the court moves to the second question: what did the parties intend the language to mean? (*Winet* v. *Price* (1992) 4 Cal.App.4th 1159, 1165 [6 Cal.Rptr.2d 554].)

Whether the contract is reasonably susceptible to a party's interpretation can be determined from the language of the contract itself (*United Teachers of Oakland* v. *Oakland Unified Sch. Dist.* (1977) 75 Cal.App.3d 322, 330 [142 Cal.Rptr. 105]) or from extrinsic evidence of the parties' intent (*Winet* v. *Price, supra,* 4 Cal.App.4th at p. 1165.) In this case the contract language itself and the conduct of the parties demonstrate the contract could reasonably be interpreted as providing only one "first period."

"A contract is ambiguous when, on its face, it is capable of two different reasonable interpretations." (*United Teachers of Oakland* v. *Oakland Unified Sch. Dist., supra,* 75 Cal.App.3d at p. 330.) Such is the case here.

The contract between SCE and Energy Development contains the following definitions:

"1.7    Expected Firm Operation for each generating unit(s):

Phase I: December 31, 1984

Phase II: September 30, 1985

"2.14  Contract Term: Period in years commencing with date of Firm Operation for the first generating unit(s) during which Edison shall purchase electric power from Seller.

"2.21  First Period: The period of the Contract Term specified in Section 3.1.

"3.1    [Term] The First Period of the Contract Term shall commence upon date of Firm Operation but not later than five years from the date of execution of this Contract.

"2.20  Firm Operation: The date agreed on by the Parties on which each generating unit(s) of the Generating Facility is determined to be a reliable source of generation and on which such unit can be reasonably expected to operate continuously at its effective rating (expressed in kW).

"12.    Termination: This contract shall terminate if Firm Operation does not occur within 5 years of the date of Contract execution."

██ The contract defines "first period" as "The period of the Contract Term specified in Section 3.1." Section 3.1, in turn, states the "first period" of the "contract term" shall commence upon the "date of Firm Operation." The term "firm operation" is defined as "The date . . . on which *each* generating unit(s) . . . is determined to be a reliable source [of energy]." (Italics added.) Because the contract specifies the "first period" commences on the date of "firm operation" and the date of "firm operation" is defined as the date on which "*each* generating unit" is determined to be a reliable source of energy it certainly can be argued there is a "first period" under the contract for each generating unit commencing when that generating unit is determined to be a reliable source of energy. The trial court concluded this was the only reasonable interpretation of the contract terms.

The contract, however, does not always use the term "firm operation" to refer to each generating unit. Section 2.14 defines "contract term" as a "Period in years commencing with date of Firm Operation for the *first* generating unit(s)." (Italics added.) In section 2.21 "first period" is defined as the period of the "contract term" specified in section 3.1. Section 3.1, as we have noted, simply states the "first period" commences on the "date of Firm Operation." It does not refer to "Firm Operation for each generating unit(s)" as in section 1.7 nor to "Firm Operation for the first generating unit(s)" as in section 2.14. However, since the "contract term" is defined by reference to firm operation for the first generating units, and the "first period" is part of the "contract term," it is reasonable to interpret "first period" in this context with reference to firm operation for the first generating units.

The interpretation SCE suggested is supported by other provisions of the contract. Section 12, for example, provides the contract "shall terminate" if firm operation does not occur within five years of the date of execution. Under the interpretation offered by SCE, the contract would not be terminated if the first turbine achieved firm operation within five years of the date the contract was executed. Under Energy Development's interpretation the entire contract could terminate unless *all* the turbines achieved firm operation within five years. We also note the term "first period" never appears in the plural as would be expected if the contract contemplated multiple "first periods."

We conclude the language of the contract can be read as providing either multiple "first periods" or a single "first period."

We do not base our finding of ambiguity solely on the language of the contract, however. SCE offered extrinsic evidence to show the contract was

not intended to create a new "first period" every time a wind-generated turbine came on line.

This extrinsic evidence consisted principally of written statements Energy Development and its president, William Adams, made to potential investors representing the higher "first period" rates would end in 1995, 10 years after the first turbines achieved "firm operation." SCE also produced a letter from Adams to SCE written in 1993 in which Adams acknowledged the "first period" would end as of December 1994 and sought to extend the period "four to five years past the 1994 cut-off date." Finally, SCE offered a decision by the California Public Utilities Commission approving the standard form contract at issue in this case and interpreting it to provide one fixed price period (i.e. "first period") of a maximum of 10 years, commencing not later than 5 years after the contract is executed.

■ The trial court refused to consider the evidence of Energy Development's statements to investors and to SCE on the issue of whether the contract was reasonably susceptible to the interpretation urged by SCE. The court did not state the basis for its ruling, but from the briefs filed in this court we gather Energy Development contended the evidence was barred under the "nonwaiver" clause of the contracts and it was irrelevant because it did not relate to the parties' performance under the contract. We hold the trial court erred in not considering this evidence on the issue of whether the contract was ambiguous.

The nonwaiver clause of the contract provides in relevant part, "The failure of either Edison or Seller to insist on any one or more instances upon strict performance of any of the provisions of the Contract or to take advantage of any of its rights hereunder shall not be construed as a waiver of any such provisions or the relinquishment of any such rights for the future . . . ."

The nonwaiver clause clearly is not applicable to the present dispute. SCE does not contend Energy Development's conduct waived any rights it had under the contract. Rather, it contends Energy Development's conduct is evidence of how it interpreted its rights under the contract. Furthermore, because the conduct at issue did not involve Energy Development's performance under the contract, its conduct did not fall within the terms of the nonwaiver clause. The nonwaiver clause in the contract is a typical contract clause providing a party's failure to enforce a provision of the contract when it had the opportunity to do so does not waive its right to enforce that provision in the future. For example, if Energy Development accepted

payment at the "second period" rate for electricity generated by some of its turbines it could argue under the nonwaiver clause it had not forfeited the right to claim payment at the "first period" rate for other turbines which came on line at the same time. Here, however, the issue is not whether Energy Development has waived any rights under the contract but what those rights are.

The rule is well settled that in construing the terms of a contract the construction given it by the acts and conduct of the parties with knowledge of its terms, and before any controversy has arisen as to its meaning, is admissible on the issue of the parties' intent. (*Universal Sales Corp.* v. *Cal. etc. Mfg. Co.* (1942) 20 Cal.2d 751, 761 [128 P.2d 665].) Contrary to Energy Development's claim, this rule is not limited to the joint conduct of the parties in the course of performance of the contract. As stated in Corbin on Contracts, "The practical interpretation of the contract by one party, evidenced by his words or acts, can be used against him on behalf of the other party, even though that other party had no knowledge of those words or acts when they occurred and did not concur in them. In the litigation that has ensued, one who is maintaining the same interpretation that is evidenced by the other party's earlier words, and acts, can introduce them to support his contention." (3 Corbin on Contracts (1960) § 558, p. 256, fn. omitted; and see, e.g., *Heston* v. *Farmers Ins. Group* (1984) 160 Cal.App.3d 402, 414-415 [206 Cal.Rptr. 585].) We emphasize the conduct of one party to the contract is by no means conclusive evidence as to the meaning of the contract. It is relevant, however, to show the contract is *reasonably susceptible* to the meaning evidenced by that party's conduct.

For the reasons set forth above, the trial court erred in concluding the language of the contract was not reasonably susceptible to the interpretation urged by SCE: that there is only one "first period" under the contract which commences when the first turbine achieves "firm operation."

III. *Factual Issues Exist as to the Reasonableness and Legality of the Contract Under the Interpretation Urged by Energy Development.*

Having determined the contract is reasonably susceptible to the meaning given it by SCE, we address the second step in the analysis—the ultimate construction to be placed on the ambiguous language. (*Winet* v. *Price, supra,* 4 Cal.App.4th at p. 1165.)

Where no extrinsic evidence is introduced or the evidence is not in conflict, an appellate court will independently construe the contract. (*Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 866 [44 Cal.Rptr.

767, 402 P.2d 839].) Where, however, a conflict in the evidence exists, it must be resolved in the trial court, as with any question of fact, before the court can declare the meaning of the contract as a matter of law. Here, no extrinsic evidence was admitted on the meaning of the term "first period" because the trial court erroneously ruled the term could not mean what SCE contended it meant. If there was no conflict in the extrinsic evidence we could proceed to resolve the meaning of the term "first period" ourselves since we would not be bound by the trial court's interpretation in any event. (*Id.* at p. 865.) However, as we explain below, our review of the record shows triable issues of fact exist as to the meaning to be given that term which preclude our independent interpretation of the contract as a matter of law.

We view the interpretation of the term "first period" as a very close question. There are of course generally accepted canons of construction which provide guidance. (See Civ. Code, §§ 1635-1654.) Of particular importance in this case is the rule "[a] contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties." (Civ. Code, § 1643.)

There is a conflict in the evidence as to whether the interpretation urged by Energy Development is reasonable and capable of being carried out.

SCE introduced evidence it would be unable to calculate the payments due under Energy Development's interpretation of the contract. According to SCE's declarations it is unable to differentiate between turbines generating energy payable at the first period rate and those generating energy payable at the second period rate. This is because the total power generated by all the turbines at any one moment in time is collected and delivered to Edison simultaneously. The power is measured by a single SCE meter. SCE has no way of determining from its records what part of the electric power received during a given billing period was produced by a specific turbine. Nor can SCE allocate payments on a pro rata basis because the turbines operate at different capacities depending on wind conditions. At any given time, some turbines may be operating continuously, some intermittently and some not at all.

Energy Development produced evidence disputing SCE's claim it could not calculate energy simultaneously produced at two different payment rates or determine payment on a pro rata basis. According to this evidence, SCE has the capability of calculating payments for energy produced at first period

and second period payment rates if it chooses to do so. Furthermore, at oral argument on this writ petition, SCE conceded Energy Development has the capability of measuring the energy produced by each of its turbines. According to Mr. Adams's declaration, SCE not only could, but presently does, calculate payment rates on a pro rata basis. Indeed, the contract seems to require SCE to prorate the payments.[2]

Thus there are triable issues of fact to be decided before the court can determine if the multiple "first periods" interpretation urged by Energy Development is reasonable and can be carried into effect.

SCE argues the interpretation of the term "first period" sought by Energy Development would give wind turbine facilities an unwarranted preference over other facilities such as cogeneration, geothermal or biomass which sell energy to SCE under the same form contract. Under Energy Development's interpretation, a wind turbine facility can obtain extended first period rates by the simple expedient of bringing its turbines on line in stages; other facilities cannot.

Energy Development responds multiple "first periods" merely recognize that wind turbine facilities are different from other facilities in that wind turbine facilities typically come on line over a period of years while other facilities, such as biomass projects, typically go on line at one time. According to Energy Development, structuring the contract so that the "first period" for each turbine begins when that turbine comes on line is necessary to allow the owners to recapture the capital cost for that turbine.

The question whether Energy Development's interpretation of the contract would discriminate against nonwind facilities is obviously an important one because such discrimination would violate Public Utility Commission directives as well as state and federal laws. This question cannot be answered based on the evidence in the record before us. More needs to be known about the effect of multiple "first periods" on the earnings of wind facilities as compared to other facilities. For example, assume a biomass plant and a wind turbine facility each with a 25-year contract, each with the same maximum capacity and each with the same "first period" payment rate. The biomass plant which came on line at full capacity the first year of the contract would receive a "first period" rate for 100 percent of its capacity in the first year of operation. A wind facility which came on line with only 10

[2]Section 10.1.2 of the contract provides, "If the monthly payment period involves portions of two different published energy payment schedule periods, the monthly energy payment shall be prorated on the basis of the percentage of days at each price."

percent of its capacity would only receive a "first period" rate for 10 percent of its capacity in that same year. Obviously the biomass plant would earn more in that year than the wind facility because it produced and sold more kilowatts of electricity. What we do not know is whether, over time, the earnings of the two facilities would even out or whether one would receive greater total earnings than the other solely due to the interpretation of what constitutes a "first period."

At trial, the parties should produce evidence as to whether multiple "first periods" would unfairly advantage wind turbine facilities over other facilities selling energy to SCE, or conversely whether imposing a single "first period" on wind turbine facilities would unfairly disadvantage this method of power generation in comparison with other methods.[3]

## DISPOSITION

Let a peremptory writ issue directing the trial court to vacate its order granting the motion for summary adjudication of plaintiffs' cause of action for declaratory relief and to enter a new and different order denying said motion.

Lillie, P. J., and Woods (Fred), J. concurred.

A petition for a rehearing was denied September 7, 1995.

---

[3]We do not imply that in interpreting the contract the trial court should limit itself to the foregoing factual issues. Rather, the trial court should determine the meaning of the contract based on its language as a whole and all relevant extrinsic evidence introduced by the parties.