[No. B206501. Second Dist., Div. Two. June 3, 2009.]

SUPERVALU, INC., Plaintiff and Appellant, v.
WEXFORD UNDERWRITING MANAGERS, INC., et al., Defendants and
Respondents.

66

## Counsel

Knapp, Petersen & Clarke, Gwen Freeman and Andre E. Jardini for Plaintiff and Appellant.

Bingham McCutchen and Robert A. Lewis for Defendant and Respondent Wexford Underwriting Managers, Inc.

Chapman, Popik & White, Susan M. Popik; The Roth Law Firm, James M. Roth and David E.C. Gettis for Defendant and Respondent TIG Insurance Company.

Sedgwick, Detert, Moran & Arnold, Bruce D. Celebrezze, Frederick D. Baker, Vanessa L. O'Brien and Brian R. Thompson for Defendant and Respondent Continental Casualty Company.

## OPINION

**ASHMANN-GERST, J.**—The issue presented is the interpretation of the word "occurrence" in the excess workers' compensation policies provided to appellant Supervalu, Inc., doing business as Albertson's, Inc. (Supervalu), by respondents TIG Insurance Company (TIG), Continental Casualty Company (Continental) and Wexford Underwriting Managers, Inc. (Wexford) (collectively respondents). The trial court concluded that Supervalu was required to pay a self-insured retention every time an employee sustained injury due to an accident or occupational disease. It granted summary adjudication in favor of TIG and Continental and summary judgment in favor of Wexford. The parties dismissed their remaining claims without prejudice in order to facilitate this appeal. Supervalu appeals on the following grounds: (1) in the workers' compensation industry, "occurrence" means a claim that results in one award or compromise and release regardless of the number of injuries involved, and this technical meaning controls interpretation of the insurance policies; (2) Continental and TIG are estopped from asserting a new interpretation, i.e., that an award or compromise and release is not a single occurrence because it involves multiple injuries; (3) TIG was not entitled to summary adjudication as to the claim involving William Lecky (Lecky) because it was not entitled to reimbursement, and its claim was time-barred; (4) Continental was not entitled to summary adjudication of the declaratory relief cause of action in its first amended cross-complaint because the motion did not resolve an entire cause of action; (5) Continental is not entitled to prejudgment interest on its reimbursement claim during the period that Wexford prevented Supervalu from paying its debt; (6) summary judgment for Wexford was error because it was a proper party to Supervalu's declaratory relief cause of action; and (7) the trial court erred when it refused to permit Supervalu to amend its pleading to allege a claim against Wexford for negligent misrepresentation. We find no error and affirm.

### FACTS

*The TIG policies*

From 1989 to 1994, TIG provided Supervalu with excess workers' compensation insurance. Supervalu's self-insured retention for each occurrence was $500,000. The TIG policies provided that the indemnity coverage was "subject to the following aggregate and per occurrence limitations. [TIG's] maximum limit of liability thereunder for loss arising out of any one occurrence shall not exceed: [¶] $1,000,000 . . . [¶] [i]n excess of [Supervalu's] retention . . . applicable to each occurrence. . . ." Subject to certain conditions, the coverage provision provided that TIG would indemnify Supervalu "for loss resulting from an occurrence during the contract period

on account of [Supervalu's] liability for damage because of bodily injury or occupational disease sustained by employees." The policy provided that "loss" "shall mean only such amounts as are actually paid by [Supervalu] in payment of benefits . . . in settlement of claims, or in satisfaction of awards or judgments"; bodily injury includes death and excludes occupational disease; and occupational disease is cumulative injury or death from cumulative injury. Occurrence, as applied to bodily injury, was defined to "mean accident." Occupational disease sustained by an employee was deemed to be a separate occurrence taking place on the last date of the employee's exposure to deleterious work conditions.

### The Continental policies

Continental provided Supervalu with excess workers' compensation insurance from 1994 to 2006. The self-insured retention and coverage were essentially the same as in the TIG policies.[1]

### This action

Supervalu sued TIG, Continental and Wexford for declaratory relief. As to Continental and Wexford, Supervalu also alleged causes of action for breach of contract and bad faith. The complaint alleged: TIG and Continental provided Supervalu with excess workers' compensation insurance from May 1, 1990, to June 2006. Though the policies were backed by TIG and Continental, they were issued by Wexford. It acted as their exclusive agent for underwriting, policy issuance and claims handling. The policies provided that TIG and Continental would indemnify Supervalu for loss in excess of the self-insured retention "resulting from an occurrence." For 15 years, respondents interpreted occurrence to mean a single, overall disability rating. In 2005, respondents asserted that when multiple injuries led to a single, overall disability rating, each injury was an occurrence subject to the self-insured retention. They refused to pay certain disputed claims based on the theory that the self-insured retention had not been reached. The disputed claims pertained to Katherine Devine, Gwen Dunnham, Kenneth Subia, Clifford Sugawara, Johnny Boydston (Boydston), Lecky, Yvonne Henry, Joella Rihner and Gloria Aguirre.

---

[1] In its statement of the case, Supervalu avers that it purchased insurance from Wexford; Wexford contracts with insurance carrier partners who, for a portion of the premium, actually fund the loss; from May 1, 1990, to May 1, 1994, TIG was Wexford's funding partner; from May 1, 1994, to May 1, 2006, Continental was Wexford's funding partner; under the policies, Supervalu was required to notify Wexford of claims that might exceed the self-insured retention; Supervalu contracted with a third party administrator to adjust claims; and TIG and Continental had the right to participate in the investigation or defense of any claim that might involve excess exposure. Supervalu did not cite any evidence to support these contentions. Instead, it cited its unverified complaint and statements in its opposition to Wexford's motion for summary judgment or adjudication.

Trial was set for February 13, 2008.

Continental cross-complained against Supervalu for breach of contract and declaratory relief. As alleged, Supervalu breached the Continental policies by, among other things, using "an incorrect formula to aggregate multiple injuries sustained by [Supervalu] employees into one injury."

TIG cross-complained against Supervalu for declaratory relief, quasi-contract, book account, money had and received, apportionment and contribution, indemnity, and interference with contractual relations. In particular, TIG sought a declaration that it did not owe benefits regarding the Boydston or Lecky claims. TIG requested reimbursement of the sums previously paid.

Continental moved for summary adjudication of the declaratory relief claim in its first amended cross-complaint and of the declaratory relief and bad faith causes of action in Supervalu's complaint. The motion asserted, inter alia, that each accident resulting in bodily injury and each occupational disease constitutes a separate occurrence under the Continental policies. TIG moved for summary adjudication and requested: a declaration that occurrence refers to a single accident resulting in bodily injury or a single occupational disease subject to a separate self-insured retention; a declaration that TIG has no duty to indemnify Supervalu unless it presents a claim that it sustained loss and claim expenses as a result of an occurrence that exceed the self-insured retention; a declaration that TIG has no duty to cover the Lecky claim; and an order awarding TIG $245,490.01 pursuant to its causes of action for quasi-contract and money had and received. Wexford moved for summary judgment or adjudication on the theory that it is an underwriting agent that cannot be liable for breach of contracts to which it was not a party.

On December 5, 2007, Supervalu filed an application for an order shortening time to hear a motion for leave to file an amended complaint. In the alternative, it requested an order rescheduling the summary judgment and summary adjudication motions to a date after January 16, 2008.[2]

On December 7, 2007, Supervalu set a motion for leave to amend the complaint for January 16, 2008. The proposed pleading alleged a new claim against TIG for refusing to pay benefits, and claims against Wexford for failing to disclose Continental's intention to change its interpretation of the policy language and for failing to report claims to TIG and Continental.

At the January 2, 2008, hearing on Continental's motion, the trial court was reminded of Supervalu's pending ex parte application for an order

---

[2] Supervalu did not provide us with either a reporter's transcript from December 5, 2007, or a minute order resolving the ex parte application.

shortening time. The trial court said a motion to amend was untimely. To overcome some procedural deficiencies in its motion, Continental waived all issues set forth in its declaratory relief cause of action with the exception of the meaning of the word "occurrence." The trial court granted Continental's motion for summary adjudication regarding its declaratory relief cause of action and stated that there was no basis to conclude that one award was the equivalent of one occurrence. Though Supervalu argued that Continental was estopped from asserting a new interpretation, the trial court pointed out that the doctrines of waiver and estoppel based on conduct cannot create coverage where none exists. The motion was denied insofar as it pertained to Supervalu's claims for breach of contract, declaratory relief and bad faith.

The trial court granted summary adjudication of TIG's cause of action for reimbursement of money paid on the Lecky claim. The trial court reiterated its belief that one award was not the equivalent of one occurrence. It then ruled: Each of the occurrences happened in 1996, which was outside TIG's coverage. Nonetheless, TIG paid $245,490.01 in benefits on the Lecky claim. TIG was entitled to reimbursement.

Last, the trial court granted Wexford's motion. The trial court ruled that Wexford could not be liable for breaching policies to which it was not a party.

The parties agreed to dismiss their remaining causes of action without prejudice. Judgment was entered.

This appeal followed.

## STANDARD OF REVIEW

Summary judgment is subject to independent review. (*Reyes v. Kosha* (1998) 65 Cal.App.4th 451, 466, fn. 6 [76 Cal.Rptr.2d 457].) To assess the record for error, we utilize a three-step analysis: "First, we identify the issues framed by the pleadings. Next, we determine whether the moving party has established facts justifying judgment in its favor. Finally, if the moving party has carried its initial burden, we decide whether the opposing party has demonstrated the existence of a triable, material fact issue. [Citation.]" (*Chavez v. Carpenter* (2001) 91 Cal.App.4th 1433, 1438 [111 Cal.Rptr.2d 534].)

The denial of a motion for leave to amend a pleading will not be disturbed absent a clear showing of abuse. (*Branick v. Downey Savings & Loan Assn.* (2006) 39 Cal.4th 235, 242 [46 Cal.Rptr.3d 66, 138 P.3d 214].)

## DISCUSSION

Supervalu argues that the phrase "per occurrence" in the policies refers to a claim which results in one award or compromise and release; Continental and TIG are estopped from asserting a new interpretation; the trial court erred when it granted TIG's motion for summary adjudication as to Lecky; the trial court's ruling as to Continental was procedurally improper; Wexford should not be immunized from liability; prejudgment interest cannot accrue during the time a creditor prevents payment of the debt; and the trial court should have allowed Supervalu to amend to allege negligent misrepresentation against Wexford.

Upon review, we find no error.

### I. *Interpretation of occurrence.*

Supervalu contends that an occurrence refers to a situation in which there is one award or compromise and release even if the employee sustained multiple injuries. This contention requires contract interpretation.

#### A. *The law.*

■ The ordinary rules of contract interpretation apply when construing terms in an insurance policy. (*London Market Insurers v. Superior Court* (2007) 146 Cal.App.4th 648, 656 [53 Cal.Rptr.3d 154] (*London Market*).) ■ Subject to the other rules of interpretation, the language of a contract governs its interpretation if the language is clear and explicit and does not involve an absurdity. (Civ. Code, §§ 1638, 1639.)[3] The whole contract must be considered together in order to "give effect to every part, if reasonably practicable, each clause helping to interpret the other." (§ 1641.) "The words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning; unless used by the parties in a technical sense, or unless a special meaning is given to them by usage, in which case the latter must be followed." (§ 1644.) "Technical words are to be interpreted as usually understood by persons in the profession or business to

---

[3] All further statutory references are to the Civil Code unless otherwise indicated.

which they relate, unless clearly used in a different sense." (§ 1645.) "A contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates." (§ 1647.)

■ To the extent the foregoing rules involve parol evidence,[4] the evidence is admissible as follows: "The determination whether to admit parol evidence involves a two-step process. 'First, the court provisionally receives (without actually admitting) all credible evidence concerning the parties' intentions to determine "ambiguity," i.e., whether the language is "reasonably susceptible" to the interpretation urged by a party. If in light of the extrinsic evidence the court decides the language is "reasonably susceptible" to the interpretation urged, the extrinsic evidence is then admitted to aid the second step—interpreting the contract.' " (*General Motors Corp. v. Superior Court* (1993) 12 Cal.App.4th 435, 441 [15 Cal.Rptr.2d 622] (*General Motors*).)

### B. *Patent ambiguity.*

Supervalu argues that the contract language is ambiguous on its face and the trial court erred in not considering extrinsic evidence.

■ A term in an insurance contract is ambiguous if it is capable of two or more reasonable constructions. (*London Market, supra*, 146 Cal.App.4th at p. 656.)

The policies insured Supervalu "for loss resulting from an occurrence during the contract period on account of [Supervalu's] liability for damage because of bodily injury or occupational disease sustained by employees." Loss was defined as the amount paid in benefits in settlement of claims or satisfaction of awards or judgments. With respect to bodily injury, "occurrence" was defined as an accident. "Occupational disease" was defined as cumulative injuries. Further, the policies provided that occupational disease "sustained by each employee shall be deemed to be a separate occurrence and occurrence shall be deemed to take place on the date upon which the employee is last exposed at work to conditions allegedly causing such occupational disease."

---

[4] The parol evidence rule is set forth in Code of Civil Procedure section 1856. Subdivision (c) of the statute provides that the terms in a writing intended as a final expression of the parties' agreement "may be explained or supplemented by course of dealing or usage of trade or by course of performance." (Code Civ. Proc., § 1856, subd. (c).)

To pinpoint a facial ambiguity, Supervalu avers: The definition of occurrence is limited to distinguishing between bodily injury claims and occupational disease claims when more than one employee is injured. The contractual language is ambiguous with respect to the single-employee situation.

We cannot concur.

■ The definition of occurrence does not distinguish between situations in which single employees or multiple employees are injured. This is because an occurrence is an event—either an accident or occupational disease. In the case of an accident, the number of employees injured is not relevant. It could be one or many and it would still be one occurrence. In contrast, there are as many occurrences—singular or plural—as there are employees who suffer occupational disease.

But absence of patent ambiguity does not end the analysis. Ambiguity can be established through extrinsic evidence.

C. *Latent ambiguity.*

The initial question under *General Motors*, *supra*, 12 Cal.App.4th 435, is whether Supervalu's extrinsic evidence was admissible to aid contract interpretation.

On its face, the contractual language is not ambiguous. It suggests that an occurrence involves either an accident or cumulative injuries. In other words, occurrences are events which cause an employee to suffer damage, i.e., they are referred to as events sustained by an employee, not Supervalu. An award or a compromise and release compensate an employee for damage. If Supervalu is liable to pay the benefit, it is defined as a loss. Further, awards and settlements are deliberate actions and cannot be called accidents. Neither is it reasonable to conclude that, for purposes of occupational disease, awards and settlements take place on the date upon which the employee was last exposed to deleterious conditions. Because accidents and occupational diseases precipitate awards and settlements, there is a necessary temporal distinction that factors into our analysis. Nonetheless, extrinsic evidence is admissible to shed light on the meaning of the contractual language if it shows that the language is reasonably susceptible to Supervalu's interpretation.

To demonstrate ambiguity, Supervalu submitted declarations from various workers' compensation industry insiders.

Irene Hernandez declared that when an employee has more than one application for workers' compensation benefits for the same or similar body parts, or for some of the same or similar body parts, it is typical in the industry to set up a master file upon which all amounts should be paid. In her experience, excess carriers typically treat all payments made off the master file as one occurrence for purposes of self-insured retention or deductible considerations.

Rachael Ruther declared: "In my experience, where injuries to an employee become permanent and stationary at the same time, the [workers' compensation judge] will resolve those claims together, either by a findings and award, a compromise and release or a stipulated findings and award. By custom and practice in the industry, this would be considered one claim for purpose of applying amounts paid toward exhaustion of a self-insured retention."

Other declarants offered similar evidence.

Supervalu argues that this custom and practice evidence was admissible and controlling under section 1644 because occurrence was used in a technical sense or had special meaning. This argument is unavailing.

■ The problem is that the declarants suggest an industry definition of occurrence that is antithetical to the contractual language. Occurrence, as we have indicated, is a cause of employee damage rather than the loss to Supervalu. Parol evidence is not admissible "to flatly contradict the express terms" of an agreement. (*Winet v. Price* (1992) 4 Cal.App.4th 1159, 1167 [6 Cal.Rptr.2d 554].) The contractual language is not reasonably susceptible to Supervalu's interpretation.

■ Section 1644 does not trump this analysis. Supervalu did not advert to evidence that the parties used occurrence in a technical sense or gave it special meaning. By this we mean that the declarants did not set forth evidence that the parties negotiated the contract language. They simply declared the meaning given to the word in the industry. Under section 1645, technical words cannot be interpreted as usually understood by persons in the insurance industry if the words are clearly used in a different sense. Here, occurrence was clearly used in a different sense. Moreover, section 1644 is just one of many rules, and it is still subject to the prohibition in *General Motors, supra,* 12 Cal.App.4th 435, against extrinsic evidence that does not support a reasonable interpretation. And, in our view, the policy language is clear and explicit and does not involve an absurdity. Pursuant to sections 1638 and 1639, the language must govern.

Next, Supervalu asks us to consider sections 1643 and 1653. Section 1643 provides: "A contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties." Section 1653 provides: "Words in a contract which are wholly inconsistent with its nature, or with the main intention of the parties, are to be rejected." The thrust of Supervalu's position vis-à-vis these statutes is twofold. Workers' compensation law and procedure does not lend itself to the type of causation allocation envisioned by respondents. Further, the parties must have intended to provide indemnity for the losses to which the insurance relates, and losses are embodied in awards and settlements. We recognize that our interpretation makes adjustment of claims more difficult than Supervalu's interpretation, but the parties agreed to the policy language and we have no power to rewrite it. And, in any event, the policy language is not inconsistent with the apportionment of benefits envisioned by the Labor Code.

Labor Code section 3208.2 provides: "When disability, need for medical treatment, or death results from the combined effects of two or more injuries, either specific, cumulative, or both, all questions of fact and law shall be separately determined with respect to each such injury, including, but not limited to, the apportionment between such injuries of liability for disability benefits, the cost of medical treatment, and any death benefit." Labor Code section 5303 provides: "There is but one cause of action for each injury coming within the provisions of this division. All claims brought for medical expense, disability payments, death benefits, burial expense, liens, or any other matter arising out of such injury may, in the discretion of the appeals board, be joined in the same proceeding at any time; provided, however, that no injury, whether specific or cumulative, shall, for any purpose whatsoever, merge into or form a part of another injury; nor shall any award based on a cumulative injury include disability caused by any specific injury or by any other cumulative injury causing or contributing to the existing disability, need for medical treatment or death." These two statutes illustrate that even if there is a master file, benefits must be apportioned.

II. *Waiver and estoppel.*

■ Supervalu argues that there is a triable issue as to whether respondents are barred by waiver and estoppel from asserting their interpretation of the policies. The record establishes otherwise.

■ Waiver is an intentional relinquishment of a known right after knowledge of the facts. It may be either express or implied. (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 31–32 [44 Cal.Rptr.2d 370, 900 P.2d 619].)

When a party's statement or conduct intentionally leads a second party to believe a particular thing and reasonably rely on that belief, the second party cannot take a contrary position during litigation. (*Westoil Terminals Co., Inc. v. Industrial Indemnity Co.* (2003) 110 Cal.App.4th 139, 152 [1 Cal.Rptr.3d 516]; *Martinez v. Scott Specialty Gases, Inc.* (2000) 83 Cal.App.4th 1236, 1248 [100 Cal.Rptr.2d 403].) The doctrine operates defensively only. In other words, it protects a party from unfair advantage sought by another. It is not designed to permit a person, offensively, to thereby obtain unfair advantage. (*Peskin v. Phinney* (1960) 182 Cal.App.2d 632, 636 [6 Cal.Rptr. 389].)

Pertinent here is the following wrinkle. " ' " 'The rule is well established that the doctrines of implied waiver and of estoppel, based upon the conduct or action of the insurer, are not available to bring within the coverage of a policy risks not covered by its terms, or risks expressly excluded therefrom, and the application of the doctrines in this respect is therefore to be distinguished from the waiver of, or estoppel to assert, grounds of forfeiture. . . .' " ' [Citation.]" (*Manneck v. Lawyers Title Ins. Corp.* (1994) 28 Cal.App.4th 1294, 1303 [33 Cal.Rptr.2d 771]; see *Aetna Casualty & Surety Co. v. Richmond* (1977) 76 Cal.App.3d 645, 653 [143 Cal.Rptr. 75], citing *Insurance Co. of North America v. Atlantic National Ins. Co.* (4th Cir. 1964) 329 F.2d 769, 775 ["there is a definite distinction between the waiver of a right to declare a forfeiture, to cancel or to rescind based upon some breach of a condition of the policy on the one hand and the extension of coverage provided by the policy on the other"].)

Supervalu suggests that waiver and estoppel are triggered because respondents paid past claims and settlements without requiring apportionment between events causing damage to employees. But Supervalu does not point to any evidence that respondents intentionally waived their rights as to current claims. Further, the policy language does not cover any risks except liability for benefits above the self-insured retention for each accident and occupational disease. As a consequence, Supervalu is asserting estoppel to expand coverage under the policies, which is impermissible, rather than to simply avoid a forfeiture of benefits. The consequence is plain under case law. Supervalu cannot establish waiver or estoppel.

III. *Summary adjudication for TIG.*

Supervalu contends that TIG was not entitled to reimbursement of the $245,490.01 it paid on the Lecky claim. In the alternative, Supervalu contends that it cannot be held liable for a portion of the prejudgment interest because it was prevented from paying the debt by Wexford, TIG's agent.

These contentions lack merit.

## A. *Reimbursement.*

TIG provided excess workers' compensation insurance to Supervalu until May 1, 1994. And, according to Supervalu, the workers' compensation judge found that Lecky suffered a specific injury to his hand on April 17, 1996, and two periods of cumulative trauma, each concluding on June 11, 1996. As to the specific injury, the occurrence happened on the date of the accident, which was April 17, 1996. As to the cumulative traumas, the occurrences happened on the last day of exposure to the deleterious conditions, which was June 11, 1996. The trial court properly ruled that these occurrences were not covered. The indemnity provision only applies to liability from occurrences within the policy period.

Supervalu tacitly concedes the trial court's finding that the Lecky claim did not fall within any coverage provisions. It argues, however, that TIG cannot obtain relief for quasi-contract and money had and received.

If an entity obtains a benefit that it is not entitled to retain, the entity is unjustly enriched. The aggrieved party is entitled to restitution, which is synonymous with quasi-contractual recovery. (1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 1013, p. 1102.) "As a general rule, equitable concepts of unjust enrichment dictate that when a payment is made based upon a mistake of fact, the payor is entitled to restitution unless the payee has, in reliance on the payment, materially changed its position. [Citation.]" (*City of Hope Nat. Medical Center v. Superior Court* (1992) 8 Cal.App.4th 633, 636–637 [10 Cal.Rptr.2d 465] (*City of Hope*).)

Supervalu suggests that the existence of a contractual relationship precludes quasi-contract relief. It adverts to 4 Witkin, California Procedure (5th ed. 2008) Pleading, § 561, page 688, which cites *Minor v. Baldridge* (1898) 123 Cal. 187, 191 [55 P. 783] (*Minor*). Witkin states that the common count of money had and received is available in quasi-contract actions "to recover money paid under mistake, fraud, or coercion, where no contractual relationship is involved. [Citations.]" (4 Witkin, *supra*, § 561, pp. 688–689.) The remedy is available in a variety of other situations, as well. (*Id.* at pp. 688–690.) Witkin, however, does not state that the existence of a contract bars quasi-contract relief. *Minor*, cited by Witkin, is ample explanation why.

The parties in *Minor* entered into an agreement which required the plaintiff to make installment payments dependent on the defendant's progress in building a railroad. (*Minor, supra*, 123 Cal. at p. 188.) "Some time after the

contract had been signed [an agent for the defendant] . . . represented to plaintiff that a terminal had been secured on Humboldt Bay, and therefore the first installment was due." (*Ibid.*) The agent also said the defendant would buy lumber from the plaintiff. The plaintiff believed the representations and paid $1,000. In fact, no terminal had been secured on Humboldt Bay, and the defendant never offered to purchase lumber. (*Id.* at p. 189.) The court explained that in common law "the common count for money had and received could be used to recover money obtained by false and fraudulent representations. [Citation.]" (*Id.* at p. 190.) This led the court to state: "The action is not based upon a breach of a contract, nor is it necessary to have a rescission of the contract to enable plaintiff to maintain his action. The theory is, that the money was obtained upon a false representation that it had become due under the contract, by the performance of the condition precedent by the [defendant]. This might all be, and the contract still remain in force. In such event, the [defendant] may yet perform and become entitled to demand and enforce payment from plaintiff." (*Id.* at p. 191.)

Next, Supervalu assails TIG's award by arguing that it cannot credibly claim that it made the payment by mistake. This argument, however, is unsupported by even a cursory assessment of the underlying record.

 Supervalu states, "TIG or its agent had all of the facts before any payments were made, including what its own policy provided, the dates alleged, and the date of surgery. TIG now claims it was 'mistaken'—for 15 years—about what its own policy really meant, presumably asserting a mistake of law. But changing one's mind is not a mistake." There is no citation to TIG's cross-complaint, its separate statement, or its evidence. The absence of record citations undermines Supervalu's attack. "[S]tatements of fact contained in . . . briefs which are not supported by the evidence in the record must be disregarded. [Citations.]" (*Tisher v. California Horse Racing Bd.* (1991) 231 Cal.App.3d 349, 361 [282 Cal.Rptr. 330].) Further, we are " 'not required to make an independent, unassisted study of the record in search of error or grounds to support the judgment.' [Citations.]" (*Guthrey v. State of California* (1998) 63 Cal.App.4th 1108, 1115 [75 Cal.Rptr.2d 27].) A party must refer us to the portion of the record which supports its position on appeal. "If no citation 'is furnished on a particular point, the court may treat it as waived.' [Citation.]" (*Ibid.*)

Citing *City of Hope*, Supervalu contends that unless it misled TIG, then TIG cannot demand reimbursement. *City of Hope* involved a mistaken payment to a hospital, the insured's third party creditor. The insurance company sued the hospital for restitution after determining that there was no coverage. The court stated: "Restitution will be denied . . . if the mistaken payment is made to a bona fide creditor of a third person—a creditor without

fault because it made no misrepresentations to the payor and because it had no notice of the payor's mistake at the time the payment was made. [Citations.]" (*City of Hope, supra,* 8 Cal.App.4th at p. 637.) This rule applied unless the third party creditor misled the payor or knew of the mistake. (*Ibid.*) Supervalu was the insured, not a third party creditor of the insured, so *City of Hope* does not prevent TIG from going after Supervalu for restitution.

The ensuing layer of argument is easily disposed of. Supervalu informs us that restitution is improper because it was not unjustly enriched. This is simply untrue. Supervalu obtained funds rightfully belonging to TIG and was spared from paying $245,490.01 out of its own pocket. It does not matter that Supervalu may have been entitled to coverage from Continental and therefore did not receive any more money than its contracts dictated. It unjustly received the money from TIG instead of Continental, which makes all the difference.

The foregoing aside, Supervalu implies that TIG waived its claim by failing to reserve its rights. Despite this, Supervalu does not tell us why the trial court misjudged the issue. The trial court cited *Ringler Associates Inc. v. Maryland Casualty Co.* (2000) 80 Cal.App.4th 1165, 1189 [96 Cal.Rptr.2d 136], and other cases for the proposition that an insurer's failure to reserve its rights does not waive its coverage defense, especially if it was not aware of the defense when it paid benefits. It cited the declaration of a TIG representative as stating that TIG mistakenly paid the $245,490.01 in benefits because Wexford reported the injury date as being December 1, 1992. According to the trial court, the mistake was clear but initially overlooked by TIG based on a mistake which Supervalu should have caught. Supervalu does not contend that this analysis was error. Insofar as this point is implied, it is not developed. "It is not our responsibility to develop an appellant's argument." (*Alvarez v. Jacmar Pacific Pizza Corp.* (2002) 100 Cal.App.4th 1190, 1206, fn. 11 [122 Cal.Rptr.2d 890].)

Last, Supervalu claims that TIG's claim is barred by the three-year statute of limitations set forth in Code of Civil Procedure section 338. This raises a variety of questions, such as when the cause of action accrued and when the statute of limitations expired. The trial court ruled that the statute of limitations did not begin running until the last payment was made, so TIG's claim for reimbursement was not subject to a time bar. Supervalu chose to ignore this ruling. Beyond that, Supervalu did not analyze when the cause of action accrued. It states that TIG knew of Lecky's three periods of injury as early as 1998, and that TIG received a copy of the joint findings and award in April 2002. Supervalu then states that TIG had to file its action by April 2005, at the very latest. Why? Supervalu never says. " '[E]very brief should

contain a legal argument with citation of authorities on the points made. If none is furnished on a particular point, the court may treat it as waived, and pass it without consideration.' [Citation.] [¶] It is the duty of [appellant's] counsel, not of the courts, 'by argument and the citation of authorities to show that the claimed error exists.' [Citation.]" (*Sprague v. Equifax, Inc.* (1985) 166 Cal.App.3d 1012, 1050 [213 Cal.Rptr. 69].)

### B. *Prejudgment interest.*

Supervalu argues that it should not be held liable for prejudgment interest because Wexford, TIG's agent, was at fault for reporting the Lecky claim to TIG instead of Continental. We disagree.

Section 3287, subdivision (a) provides: "Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day, except during such time as the debtor is prevented by law, or by the act of the creditor from paying the debt."

The trial court awarded $69,947 in prejudgment interest from the date of demand, May 5, 2005. Nothing prevented Supervalu from paying the debt once TIG made a demand for payment.

## IV. *Summary adjudication for Continental.*

Supervalu asks us to reverse summary adjudication in favor of Continental on the theory that it did not ask for a declaration regarding any particular claim and therefore did not resolve a cause of action. In essence, it argues that the order interpreting occurrence was not permissible. We disagree.

"Any person interested under a written . . . contract . . . who desires a declaration of his or her rights or duties with respect to another . . . may, in cases of actual controversy relating to the legal rights and duties of the respective parties, bring an original action . . . for a declaration of his or her rights and duties . . . . He or she may ask for a declaration of rights or duties, either alone or with other relief; and the court may make a binding declaration of these rights or duties, whether or not further relief is or could be claimed at the time. The declaration may be either affirmative or negative in form and effect, and the declaration shall have the force of a final judgment. The declaration may be had before there has been any breach of the obligation in respect to which said declaration is sought." (Code Civ. Proc., § 1060.)

In its first amended cross-complaint, Continental alleged, inter alia, that Supervalu was using an incorrect formula to investigate and handle claims. Continental requested a declaration that Supervalu must comply with the terms of the Continental policies. Then, at oral argument, Continental waived all of its allegations except to the extent it requested an interpretation of occurrence. The trial court resolved that issue, which thereby disposed of an entire cause of action. There was no requirement that the declaration resolve a particular claim. Code of Civil Procedure section 1060 permits a declaration of the parties' rights and duties even if no other relief is requested, and even if there has not been a breach of contract.

Supervalu rejects this analysis. It cites *Hood v. Superior Court* (1995) 33 Cal.App.4th 319, 322–323 [39 Cal.Rptr.2d 296] (*Hood*). In *Hood*, the question was whether a party could select issues implicated in a cause of action in its complaint or cross-complaint, amend that pleading to add a cause of action for declaratory relief as to those issues, and then obtain summary adjudication of the declaratory relief cause of action. The *Hood* court answered in the negative because such actions would subvert the requirement in Code of Civil Procedure section 437c, subdivision (f)(1) that a motion for summary adjudication dispose of a cause of action, affirmative defense, claim for damages, or an issue of duty. (*Hood, supra*, 33 Cal.App.4th at p. 321.) The court stated declaratory relief " 'should not be used for the purpose of anticipating and determining an issue which can be determined in the main action. The object of the statute is to afford a new form of relief where needed and not to furnish a litigant with a second cause of action for the determination of identical issues.' [Citations.]" (*Id.* at p. 324.)

The reason *Hood* is not controlling is explained in *Southern Cal. Edison Co. v. Superior Court* (1995) 37 Cal.App.4th 839, 846 [44 Cal.Rptr.2d 227] (*Southern California Edison*). That case involved litigation over contracts to purchase electricity produced by wind-driven turbines. Each contract was divided into a "first period" and "second period." Due to a dispute over the meaning of the term "first period," the plaintiff sued for declaratory relief, specific performance and breach of contract. It then moved for summary adjudication of the declaratory relief cause of action. Based on *Hood*, the defendant filed a petition for writ of mandate on the theory that the plaintiff's motion did not dispose of an entire cause of action. The court decided in favor of the plaintiff. It explained: "In our view, *Hood* does not stand for the proposition the trial court cannot grant summary adjudication of a properly pled cause of action for declaratory relief merely because the controversy between the parties spills over into other causes of action. Rather, the plain lesson of *Hood* is that parties will not be allowed to misuse the declaratory

relief cause of action in an attempt to subvert the requirement a summary adjudication must completely dispose of a cause of action. [¶] In the case before us, [the plaintiff's] cause of action for declaratory relief alleges a controversy exists between it and [the defendant] over whether the contracts provide for a separate 'first period' payment rate for each wind turbine as it comes on line or whether the contracts provide for one 'first period' payment rate which took effect when the first wind turbine came on line. [¶] The interpretation of a contract is clearly a proper subject of declaratory relief. . . . The fact the same issue of contract interpretation is also raised in other causes of action does not in itself bar declaratory relief or summary adjudication of that cause of action." (*Southern California Edison, supra*, 37 Cal.App.4th at pp. 846–847.)

Because Continental merely requested contract interpretation in its declaratory relief cause of action, it did not subvert the purpose of Code of Civil Procedure section 437c, subdivision (f)(1). We agree with *Southern California Edison* that, with this fact pattern, *Hood* is not controlling.

To cap off its assignment of error, Supervalu urges us to conclude that the trial court improperly granted the motion because the declaratory relief cause of action presented only an abstract or academic dispute. It is true that declaratory relief requires an actual controversy, but one exists. The parties sued each other over whether Continental must pay excess benefits.

V. *Summary judgment for Wexford; denial of the motion for leave to amend.*

Wexford obtained summary judgment on the theory that it was an agent and could not be held liable for the actions of Continental and TIG. Supervalu argues that Wexford was a proper party to the declaratory relief cause of action because it sold the policies at issue and was an interested party. Next, Supervalu argues that it was error for the trial court to deny its motion for leave to amend the pleading to sue Wexford for negligent misrepresentation.

We turn to these issues and perceive no basis to reverse.

To establish that Wexford is a proper party to the declaratory relief claim in the complaint, Supervalu cites *State Farm General Ins. Co. v. Majorino* (2002) 99 Cal.App.4th 974 [121 Cal.Rptr.2d 719] (*State Farm*) and *General Ins. Co. v. Whitmore* (1965) 235 Cal.App.2d 670 [45 Cal.Rptr. 556] (*General Insurance*). *State Farm* involved plaintiffs who were assaulted by the insureds and sued them. The insurance company sued the plaintiffs and the insureds for declaratory relief regarding its duty to indemnify. The court stated in a

footnote that the plaintiffs were proper parties. (*State Farm, supra,* 99 Cal.App.4th at p. 978, fn. 2.) *General Insurance* held that third party claimants who are injured by an insured have an interest in disputes over coverage. (*General Insurance, supra,* 235 Cal.App.2d at pp. 674–675.) Neither case is apposite. Wexford is not a third party claimant for damages against Supervalu.

More importantly, Supervalu has not adverted to any allegations in its complaint as to which there are triable issues. Nor has Supervalu pointed to the separate statements submitted by the parties or to material evidentiary conflicts. In an evidentiary vacuum, Supervalu states that the policies impose "an important duty on Wexford to transmit notice from [Supervalu] to the excess carrier. As just one example, if it was error to put TIG on notice of Lecky, and to fail to put [Continental] on notice, Wexford was the party who erred." We have not been cited to policy language that supports these contentions. Even if we had been, Supervalu does not explain what declaration it is seeking as to Wexford. We have no obligation to guess. Suffice it to say, Supervalu's arguments on this point have been waived.

This brings us to the denial of the motion for leave to amend. The trial court did not formally hear the motion. When told of the ex parte application for an order shortening time, it denied the motion due to lack of diligence and because it was brought too close to the trial date. To establish error, Supervalu relies on Code of Civil Procedure sections 426.50 and 473, subdivision (a)(1) for the proposition that a trial court can allow a party to file an amended pleading at any time during the course of an action. Supervalu cites *Nestle v. City of Santa Monica* (1972) 6 Cal.3d 920, 938–939 [101 Cal.Rptr. 568, 496 P.2d 480] (there is a general rule "of liberal allowance of amendments") and *Mabie v. Hyatt* (1998) 61 Cal.App.4th 581, 596 [71 Cal.Rptr.2d 657] ("[i]f discovery and investigation develop factual grounds justifying a timely amendment to a pleading, leave to amend must be liberally granted") to suggest that the ruling transgressed public policy.

In its opening brief, Supervalu does not cite any evidence to refute the finding that it lacked diligence, nor did Supervalu cite any law suggesting this was insufficient grounds for the order. As a result, Supervalu failed to demonstrate error.[5] All other issues raised in the appeal are moot.

---

[5] In its reply, Supervalu argues for the first time that the trial court erred by failing to consider whether an amendment would prejudice Wexford. We decline to consider this issue. " 'A point not presented in a party's opening brief is deemed to have been abandoned or waived. [Citations.]' [Citation.]" (*Wurzl v. Holloway* (1996) 46 Cal.App.4th 1740, 1754, fn. 1 [54 Cal.Rptr.2d 512].)

## DISPOSITION

The orders are affirmed.

Respondents shall recover their costs on appeal.

Boren, P. J., and Doi Todd, J., concurred.

On June 24, 2009, the opinion was modified to read as printed above.