Filed 3/27/19; Certified for Publication 4/16/19 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| HAROLD BROWN, et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> GERALD GOLDSTEIN, et al. <br><br> Defendants and Respondents. | B278949 <br><br> (Los Angeles County <br> Super. Ct. No. BC559691) |

   APPEAL from a judgment of the Superior Court of Los Angeles County, William F. Fahey, Judge.  Reversed.

   Freundlich Law, Kenneth D. Freundlich and Michael J. Kaiser; Law Offices of Max J. Sprecher and Max J. Sprecher, for Plaintiffs and Appellants.

   Klapach & Klapach and Joseph S. Klapach; Kozberg & Bodell and Gregory Bodell, for Defendants and Respondents.

————————————

Former and current members of the band WAR filed a breach of contract action alleging that their music publisher had failed to pay them a share of the royalties generated from public performances of the band's songs.

The publisher filed a motion for summary judgment arguing that the parties' music publishing agreement did not require it to pay the band any royalties derived from song performances. Plaintiffs, however, argued the agreement was ambiguous, and filed extrinsic evidence in support of their interpretation. The trial court concluded the agreement was not reasonably susceptible to the plaintiffs' proposed interpretation, and granted judgment in the publisher's favor. We reverse.

## FACTUAL BACKGROUND

### A. Background Information Regarding the Music Publishing Industry

A music publishing agreement is a contract between a songwriter and a publishing company that sets forth the ownership of the copyright in the subject musical compositions, and the division of revenue generated from the use of those compositions. Under the traditional form of music publishing agreement, the songwriter assigns his or her copyright interest in the composition to the publisher. In return, the publisher agrees to promote and exploit the composition on the market, and pay the songwriter his or her share of royalties. (See generally *Broadcast Music, Inc. v. Roger Miller Music, Inc.* (6th Cir. 2005) 396 F.3d 762, 765 (*Roger Miller)* [describing the "basics of the music industry"].)

There are four primary categories of royalty income generated from music publishing: (1) "mechanical royalties,"

2

consisting of income from the sale of records, audiocassettes, compact discs, etc.; (2) "synchronization royalties," consisting of income from music that is synchronized with a visual image, such as a movie, television show or commercial; (3) "song book and folio royalties," consisting of income from the sale of printed music; and (4) "public performance royalties," consisting of income from public performances of the music composition, including, for example, radio broadcasts, streaming broadcasts and live performances in music venues.

In standard publishing agreements, the publisher is responsible for collecting the first three categories of royalties from third parties who have licensed the composition, and then paying the songwriter his or her contracted share of those royalties, typically 50 percent. However, the writer and publisher normally agree to affiliate with a "performing rights organization" (PRO) to collect and distribute public performance royalties (hereafter performance royalties or performance income). "Broadcast Music, Inc. (BMI) and the American Society of Composers, Authors and Publishers (ASCAP) are the two principal [PROs] operating in the United States."[1] (*Roger Miller, supra,* 396 F.3d at p. 765.) "Commonly, writers and publishers

---

[1] "ASCAP was created in 1914 by music creators and publishers as an unincorporated membership association. BMI was founded by broadcasters in 1939. Each represents hundreds of thousands of songwriters, composers, and publishers who hold copyrights in millions of musical works. They negotiate, implement, and enforce agreements with licensees that grant the right to perform their members' copyrighted songs. . . . Together, ASCAP and BMI license the music performance rights to most domestic copyrighted music in the United States." (*Broadcast Music, Inc. v. DMX Inc.* (2d Cir. 2012) 683 F.3d 32, 36.)

agree to be paid their respective shares of performing rights royalties directly by the [PRO]." (*Ibid*.)  As with most other forms of music publishing income, the songwriter is typically entitled to 50 percent of the performance royalties, and the publisher is entitled to the remaining 50 percent.

### B. Summary of the Parties' Agreements
#### 1. The 1970 Agreement

In 1970, each member of the band WAR entered into an identically-worded music publishing agreement with Far Out Music (FOM), then owned by Gerald Goldstein and his now-deceased partner, Stephen Gold.  In exchange for each band member's copyrights to the music compositions he had written (or co-authored), FOM agreed to pay the following royalties, set forth in paragraph 9: (1) 4 cents per copy of sheet music, and 10 percent of income generated from sale of music folios; and (2) 50 percent of the net sums received from mechanical royalties, synchronization royalties and foreign income (income generated from the sale or license of the compositions outside the United States).  Paragraph 9(d) of the Agreement, however, directed that the writer "shall receive his public performance royalties . . . directly from his own affiliated performing rights society and shall have no claim whatsoever against publisher for any royalties received by publisher as a distribution from any performing right society which makes payment directly . . . to writers authors and composers."[2]

---

[2]    The 1970 Agreement clarified that the royalties described in paragraph 9 were "payable solely to Writer in instances where Writer is the sole author of the entire composition. . . . However, in the event that other songwriter(s) is (are) co-author(s) along

4

The 1970 Agreement did not entitle the band members to any form of payment other than the royalties set forth in paragraph 9.

### 2. *The 1972 Memorandum of Understanding*

Following the publication of a successful album in 1971, the band retained attorney Nicholas Clainos to represent them in litigation against FOM and several FOM-related entities. As part of the litigation, the band sought to terminate the 1970 Agreement, and negotiate a new agreement that included more favorable terms.

After extensive negotiations between Clainos and Stephen Gold, the parties signed a "Memorandum of Agreement" on August 22, 1972 (the MOA) that included the following preface: "Prior to the preparation of formal contracts between [the band members] and [FOM], this memorandum of agreement will confirm the agreements we have reached with respect to the subject matter contained herein." The MOA further provided that each band member would "enter into an exclusive songwriter agreement upon the terms and conditions hereinafter set forth, as well as those standard terms which are customary in the entertainment industry in the agreements of this type."

Paragraph 3(b) of the MOA described the royalties FOM had agreed to pay the band, which were essentially identical to the royalties set forth in paragraph 9 of the 1970 Agreement: "The songwriter will receive $.04 for sheet music; 10% of the wholesale selling price for other printed copies; 50% of all net

---

with the Writer on any specific work hereunder, then the foregoing royalties shall be divided equally between Writer and the other songwriters for such work unless another division of royalties is agreed upon between the parties concerned."

sums received from the utilization of mechanical, electrical transcriptions, and synchronization rights; and 50% of all foreign monies received. It is acknowledged that the writer will receive directly from his own performing rights society the writer's portion of any and all performance monies which shall become due."

In addition to the royalties described in paragraph 3(b), however, the MOA included a new provision, set forth at paragraph 3(e), that entitled the band to a share of the income FOM received from the exploitation of the compositions: "In addition to the foregoing, the writer shall receive with respect to those songs which he has written, a sum equal to 30% . . . share of publisher's income (after deduction for collection fees, direct costs and administration fees)."

The final paragraph of the MOA reiterated that the terms set forth therein "correctly reflect[ed] [the signatories'] mutual understanding. . . . Until formal contracts are entered into . . . reflecting the agreements set forth above, this memorandum of agreement shall for all purposes govern and bind the parties hereto."

### 3. *The 1972 Agreement*

Shortly after signing the MOA, the parties signed the 1972 Agreement, which was to take effect as of August 22, 1972, the same date the MOA was signed.[3]

---

[3] As with the 1970 Agreement, each member of the band signed a separate, identically-worded agreement that assigned FOM the copyrights to the musical compositions he wrote (or co-wrote) in exchange for the payments described therein. The individual 1972 Agreements likewise included language clarifying that the payments described therein were to be paid

Paragraph 7 of the 1972 Agreement set forth the royalties FOM agreed to pay the band, which were the same amounts set forth in paragraph 3(b) of the MOA. The 1972 Agreement however, contained modified language regarding the payment of performance royalties. Paragraph 7(c), for example, stated that the writer was to receive "50% of any and all net sums actually received by the Publisher from the mechanical rights, electrical transcriptions, . . . synchronization and . . . and all other rights (except as otherwise specifically provided for herein) . . ., except that the Writer shall not be entitled to share in any sum or sums received by the Publisher from [a PRO]." Paragraph 7(d) similarly provided that band members were entitled to 50 percent of the net sum of any foreign income "other than public performance uses for which Writer is paid by any [PRO]."

Finally, paragraph 7(f) confirmed that "the publisher shall not be required to pay royalties earned by reasons of the public performances of the composition; said royalties being payable only by the [PRO] with which Writer is or may in the future become affiliated."

As with the MOA, the 1972 Agreement included an additional provision, set forth at paragraph 22, that entitled the writer to receive a 30 percent share of FOM's revenue after the deduction of certain administrative costs and fees:

---

solely to the writer "in instances where Writer is the sole author and composer of the composition," and "with regard to compositions where there are other writers, the Writer shall be paid only a portion of said [payments] which shall be determined by dividing the total [payments] payable by the number of writers for such composition, unless a different division . . . is agreed up by all such writers. . . ."

22.  In addition to the royalties provided for in Paragraph 7 above, all monies actually earned and received from the sale, lease, license, disposition or other turning to account of rights in the Compositions, including all monies received in connection with the infringement by third parties of rights in the Compositions ("Composition Gross Receipts") shall be treated as follows:

(a) Publisher shall be entitled first to deduct any and all administration and related fees from the Composition Gross receipts. . . .;

(b) Publisher shall then deduct from Composition Gross Receipts . . . the royalties due to the composers of the composition in accordance with any agreement the Publisher may have with such composers;

(c) From the balance of the Composition Gross Receipts remaining . . . , Publisher shall be entitled to deduct and retain amounts equal to the following direct costs actually advanced or incurred by Publisher in realizing Composition Gross Receipts (Composition Costs):  All costs of copyrighting the composition; . . . legal fees [relating to any claim of copyright infringement]; Accounting fees. . . . [etc.];

(d) 30% of the balance of the Composition Gross Receipts remaining after the deductions provided for in Paragraphs 22(a), 22(b) or 22(c) hereof . . . shall belong to Writer and be paid to Writer . . . ."

> 4.  *The 1975 Agreement and subsequent litigation*

In 1975, FOM and the band members signed a new agreement (the 1975 Agreement) that modified the payout formula set forth in paragraph 22 of the 1972 Agreement.  The new revenue sharing provision provided that, after the

8

deductions of certain administrative costs and fees, FOM would be entitled to 25 percent of the Composition Gross Receipts, and the writer would be entitled to the remaining balance. The 1975 Agreement did not alter the definition of Composition Gross Receipts, or otherwise affect the categories of revenue that FOM was to include when calculating the amount due under paragraph 22. Instead, the new agreement only altered the formula used to determine the band member's share of Composition Gross Receipts.

In 2009 and 2011, several band members brought multiple lawsuits in connection with FOM's payment of royalties under the parties' publishing agreements. The litigation resulted in two settlement agreements, both of which contained language confirming that the 1972 Agreement and 1975 Agreement remained in effect.

### C. The Current Litigation
#### 1. Summary of plaintiffs' claims

In October 2014, several current and former band members (or their successors-in-interest) (collectively plaintiffs or the band) filed the current breach of contract action against FOM, Gerald Goldstein and numerous FOM-related entities (collectively FOM). The complaint alleged FOM had violated the terms of the 1972 Agreement by excluding public performance royalties from "Composition Gross Receipts" described in paragraph 22, denying plaintiffs their right to share in that category of income.

The complaint alleged paragraph 22 defined Composition Gross Receipts to include "all moneys" FOM had received from the sale, lease or license of the compositions, which necessarily included any performance royalties FOM had received from its

9

PRO.  The complaint further alleged FOM had consistently "paid [plaintiffs] royalties on [its share] of 'performance income' without fail for nearly four decades."  In December of 2013, however, FOM "suddenly . . . , [and] without any basis for doing so, eliminated [its] share of public performance as a category of income for which [it] w[as] paying participant royalties . . . ."

In their prayer for relief, plaintiffs sought a declaration that FOM's "share of public performance revenue is to be included in the revenue base upon which [FOM] account[s] to and pay[s] Plaintiffs pursuant . . . to paragraph 22 of the [1972 Agreement]."  They also sought contract damages for any accounting period during which FOM had excluded its performance royalties from Composition Gross Receipts.[4]

> ### 2. FOM's motion for summary judgment
> #### a. Summary of FOM's motion

FOM filed a motion for summary judgment arguing that the plain and unambiguous language of the 1972 Agreement made clear that the publisher's performance royalties were to be excluded from paragraph 22's revenue-sharing provision.  In support, FOM cited language in paragraphs 7(c) and (f) of the agreement stating that the writer was not "entitled to share in any . . . sums received by the Publisher from [any PRO]," and

---

[4]  Plaintiffs' complaint included an additional claim alleging that FOM had breached the terms of the written agreements by failing to use the revenue sharing formula set forth in the 1975 Agreement, and instead continuing to use the formula set forth in the 1972 Agreement.  During the trial court proceedings, however, plaintiffs voluntarily dismissed that portion of their complaint.  The parties agree that any continuing disputes they may have regarding the 1975 Agreement are not relevant to the issues in this appeal.

10

that "the publisher shall not be required to pay royalties earned by reasons of the public performances of the composition." According to FOM, this language unambiguously "exclude[d] . . . all public performance royalties as a source of revenue which must be included in the formulae [set forth in paragraph 22]."

FOM further asserted that paragraph 22 could not be read to "grant rights [to plaintiffs] that [were] specifically excluded by Paragraph 7." FOM explained that the revenue-sharing payment described in paragraph 22 was to be made "in addition to" whatever royalties were due under paragraph 7, which expressly excluded any type of payment for performance royalties. FOM contended that because paragraph 7 excluded performance royalties, such royalties were necessarily excluded from paragraph 22. According to FOM, any other interpretation would render paragraph 7's exclusion of performance royalties meaningless.

FOM did not submit any extrinsic evidence in support of its interpretation of the 1972 Agreement. Instead, it relied solely on the text of the agreement, and declarations authenticating the document.

### b. *Plaintiffs' opposition and extrinsic evidence*

Plaintiffs, however, argued the 1972 Agreement should be interpreted to require FOM to include performance royalties in the base amount used to calculate the revenue-sharing payment due under paragraph 22. Plaintiffs noted that paragraph 22 specifically defined Composition Gross Receipts to include "all moneys" FOM had received from the sale or lease of the compositions, and contained no language excluding performance royalties. Plaintiffs further asserted the language FOM had cited in paragraph 7 was merely intended to clarify that FOM had no

11

duty to pay plaintiffs royalties for performance revenue because the band was to receive all of its performance royalties directly from its PRO. Paragraph 22, in contrast, described a separate and distinct type of payment consisting of a share of all revenue FOM received from the exploitation of the music, including performance royalties.

In support of their opposition, plaintiffs submitted copies of all the parties' prior written agreements, and declarations from several witnesses, including: (1) Nicholas Clainos, the attorney who negotiated the 1972 Agreement on the band's behalf; (2) Michael Perlstein, an attorney specializing in the music industry; and (3) Fred Wolinsky, a certified public accountant specializing in music industry accounting.

*i.*     *Declaration of Nicholas Clainos*

Nicholas Clainos's declaration stated that his primary contact at FOM during the negotiation of the 1972 Agreement was Steven Gold, who Clainos described as a co-owner of the company. Clainos asserted that he had told Gold the band would drop its legal claims regarding the 1970 Agreement if FOM agreed to enter into a new agreement that contained a provision entitling the band to participate in "the pool of the publisher's share of money," which was to include "the entire pot of money collected by the publisher for all sources, including the publisher's share of public performance monies."

According to Clainos, "[Gold] agreed to the participation concept," and then "prepared the 1972 [MOA] as a temporary document and foundation for drafting a long form. . . . Subparagraphs (a) through (d) of paragraph 3 of the 1972 [MOA] reiterate FOM's previously existing obligation to pay [the band royalties]. . . . [¶] . . . . Paragraph 3(e) is the language

12

that [Gold] prepared based upon our discussion and our agreement for payment to my clients of a percentage of 30% of all the publisher's share of income in addition to the monies payable solely for their [royalties]."

Clainos further stated that before the parties signed the 1972 MOA, he reaffirmed with Gold that the band's 30 percent participation in FOM's share of revenue "was to include 100% of all revenue the publisher received, including the publisher's public performance revenue. [Gold] acknowledged that such was the agreement . . . ." Clainos also asserted that when drafting the 1972 Agreement, he and Gold "specifically . . . discuss[ed]" that paragraph 22 was intended to apply to all forms of revenue that FOM actually received, "including the publisher's share of public performance revenues, less only specifically delineated deductions."

*ii. Declaration of Michael Perlstein*

Michael Perlstein's declaration stated that he had over 50 years of experience representing clients in the music industry, and was "very familiar" with "the standard music publishing industry practices of [the 1970s], the customs and practices in connection with such contracts . . . and the customary usage of terminology in such contracts." Perlstein provided an overview of the music publishing industry, explaining the various forms of revenue derived from musical compositions, the origins of performing rights organizations and how publishing agreements had evolved during the 20th Century.

According to Perlstein, the plaintiffs' 1970 and 1972 Agreements reflected the favorable changes that more successful songwriters were able to impose on publishers during that era. Specifically, Perlstein explained that the original 1970

13

Agreement merely provided the band members traditional royalty payments, while the 1972 Agreement, negotiated after the band had become more successful, contained a new and additional paragraph entitling them to "receive from FOM, a portion of the publisher's share [of revenue]."

Perlstein further asserted that, "as used in publishing contracts of the period, i.e., usage of trade, the word 'all' used here in this new arrangement set forth in paragraph 22 meant what it says – *all* monies actually earned and received by a publisher such as FOM from all sources, including the publisher's share of performance royalties paid to FOM by its PRO (in this case ASCAP). This customary usage also was customarily defined by terms such as 'Composition Gross Receipts' which was used at that time (and at present) as an all-encompassing reference subject only to deductions specified directly in connection with such definition."

Perlstein contended that in his "nearly 50 years of experience of drafting and negotiating music publishing agreement[s] and evaluating them for [his] publishing catalogue clients . . ., [he had] never seen a music publishing contract which provided for songwriters to be paid a portion of the publisher's share of . . . income that did not include in its base amount, the publisher's share of public performance income."

iii.    *Declaration of Frederick Wolinsky*

Frederick Wolinsky's declaration stated that he had "more than 35 years of experience in royalty and forensic accounting in the music industry," and had personally participated in an audit between the parties in 2007. Wolinsky further asserted that he had reviewed the parties' prior publishing agreements, and "at least 30 years of statements issued by defendants." Based on his

14

review of those materials, Wolinsky concluded that until May of 2014, FOM had "consistently included [its] share of . . . public performance revenue in . . . calculat[ing] . . . and pay[ing] Plaintiffs' . . . 'participant's share' under paragraph 22 of the 1972 [Agreement]."

Wolinksy's declaration identified and attached as exhibits five accounting statements that were "consistent with the [other] statements" he had reviewed in rendering his opinion. The five statements were from six-month accounting periods in 1982, 2007, 2011 and 2013. Three of the statements (from 1982, 2007 and 2011) did not specifically reference performance royalties; instead the statements only showed the total amount of income FOM had paid to the band members for each song during that accounting period. The two other statements, which covered six-month periods in 2011 and 2013, used a different format that included a separate line item showing FOM had paid band members a share of performance royalties during that period.

Wolinksy further stated that in May of 2014, FOM sent plaintiffs a letter asserting that they were "not entitled to share in the publisher's share of performance royalties," and that some prior statements reflected an "overpayment in connection with performance royalties." The letter further explained that FOM intended to offset those overpayments against future royalty payments owed to plaintiffs. According to Perlstein, "[t]his reversed [FOM's] decades-old course of performance," and was "inconsistent with at least 30 years of prior statements."

### 3. *FOM's reply brief*

In its reply brief, FOM reasserted that "the words of the [1972 Agreement] plainly and clearly manifest the intentions of the parties in 1972 that the publisher's public performance

royalties would not be included in the calculation of royalties to plaintiffs." FOM further asserted that the trial court should not consider any of the plaintiffs' extrinsic evidence because the 1972 Agreement was not reasonably susceptible to their proposed interpretation. According to FOM, the extrinsic evidence was instead admitted for an improper purpose: "to create for the parties a contract which they did not make and . . . insert language which one party now wishes were there."

FOM also attacked the relevancy and credibility of the extrinsic evidence. First, it contended the 1972 MOA was not relevant to the interpretation of the 1972 Agreement because the MOA had been "superseded by the 1972 Agreement." Second, FOM argued that Clainos's declaration was "irrelevant" because his statements merely asserted that he and Gold had "discussions" about certain aspects of the 1972 Agreement without explaining "what the parties said to one another and what was expressly agreed between them." FOM argued Perlstein's declaration was likewise of "no value" because his customs and usage testimony conflicted with the plain language of the 1972 Agreement, which expressly excluded any form of payment for performance royalties.

Finally, FOM argued that Wolinksy's "course of performance" testimony was "irrelevant" and inadmissible because it lacked "factual and evidentiary foundation." FOM explained that although Wolinsky claimed the materials he had reviewed showed FOM had paid plaintiffs a share of performance royalties for decades, his declaration failed to "disclose how [he had] divined [t]his conclusion." FOM noted that only two of the five accounting statements Wolinsky had included with the declaration actually referenced performance royalties, which was

16

insufficient to establish a "course of performance." FOM further asserted that the letter Wolinsky had referenced in his declaration made clear that the inclusion of performance royalties in these two statements was the result of an accounting mistake.

FOM's reply brief was accompanied by evidentiary objections seeking to exclude substantial portions of the declarations and documents plaintiffs had filed in support of their opposition, including all of Wolinsky's testimony related to FOM's past payment of performance royalties.

### D. The Trial Court's Ruling and Judgment

After a hearing, the trial court issued an order granting FOM's motion for summary judgment. In its analysis, the court agreed with FOM that paragraph 7 impliedly excluded performance royalties from the payment due under paragraph 22: "The language of paragraph 7 . . . specifically excludes, in three separate subparagraphs, public performance royalties from being shared with the 'writer,' i.e., plaintiffs. It would be difficult to imagine a more clear mutual intention of the parties at that time. Nothing in the more general language of [paragraph] 22 of this agreement modifies this exclusion."

The trial court also agreed that plaintiffs' extrinsic evidence was insufficient to "avoid" the "straightforward language in the [parties' agreement]." The court first addressed Wolinsky's declaration, concluding that his statements regarding FOM's prior practice of paying plaintiffs a share of performance royalties were speculative, and lacked adequate foundation. The court explained that the accounting statements Wolinsky had attached to his declaration showed only that FOM had paid performance royalties to plaintiffs in 2011 and 2013, which was

17

"insufficient to establish a course of conduct 'for decades.'" In an accompanying order, the court sustained FOM's evidentiary objections to all of Wolinsky's "course of conduct" testimony. The court, however, overruled objections to the actual accounting statements Wolinsky had attached to his declaration.[5]

The court next addressed Clainos's declaration, concluding that the admissible portions of his statements merely showed he had discussed paragraph 22 with Gold, or otherwise related his subjective beliefs as to the meaning of paragraph 22. According to the court, Clainos's opinions regarding the meaning of paragraph 22, and his alleged discussions with Gold regarding that issue, were "insufficient to prove plaintiffs' suggested interpretation. . . ."[6]

---

[5] The court also sustained FOM's evidentiary objections to certain statements contained within the declarations of Clainos and Perlstein. Except as discussed below in footnote six (see *post,* p. 19, n. 6), when conducting our review, we will not consider any of the extrinsic evidence that the trial court ruled inadmissible. Although plaintiffs have challenged several of those evidentiary rulings, we need not address the arguments because our resolution of the case would be the same even if the evidence had been admitted.

[6] In its analysis of Clainos's declaration, the court also stated that FOM's reply brief had "object[ed] to portions of the . . . declaration which rely on hearsay statements . . . . of Steve Gold." The trial court concluded FOM's hearsay objections were "well-taken" because Gold was "a non-party," and excluded all testimony in the declaration that described statements Gold had allegedly made to Clainos. A review of FOM's reply brief, however, shows that it did not actually raise hearsay objections to Clainos's statements about what Gold had purportedly said to

18

Finally, the court addressed Perlstein's usage and custom testimony. According to the court, Perlstein's statements merely related his "legal opinions" as to the meaning of paragraphs 7 and 22, which the court deemed to be "irrelevant."

On September 16, 2016, the court entered judgment in FOM's favor.

## DISCUSSION

Plaintiffs argue that the trial court erred in concluding the 1972 Agreement is not reasonably susceptible to their proposed interpretation. Plaintiffs assert that the text of the document and the uncontroverted extrinsic evidence demonstrate that their proposed interpretation is not only reasonable, but also the correct interpretation of the parties' agreement.

### A. Standard of Review and Applicable Law
#### 1. Standard of review

---

him. Instead, FOM argued only that Clainos's testimony about his discussions with Gold was not relevant to the contract's meaning because Clainos failed to specify exactly what Gold had said to him. Moreover, the evidentiary objections FOM filed with its reply brief did not assert any hearsay objections to this portion of Clainos's declaration. Because the record establishes FOM did not raise any hearsay objection to Clainos's testimony describing what Gold said to him, it was improper for the court to exclude that portion of his declaration. (See Code of Civ. Proc., § 437c, subd. (c) ["[i]n determining whether the papers show that there is no triable issue as to any material fact the court shall consider all of the evidence set forth in the papers, except that to which objections have been made and sustained by the court. . . ."]; *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 526 [section 437c requires that, when deciding a summary judgment motion, "the trial court must consider all evidence unless an objection to it has been raised and sustained"].)

"Summary judgment is appropriate 'if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' [Citation.]. . . . [¶] Our review is de novo. [Citation.] We liberally construe the opposing party's evidence and resolve all doubts in favor of the opposing party. [Citation.] We consider all evidence in the moving and opposition papers, except that to which objections were properly sustained." (*Jacobs v. Coldwell Banker Residential Brokerage Co.* (2017) 14 Cal.App.5th 438, 443.)

2. *Rules governing the interpretation of contracts*

"The rules governing the role of the court in interpreting a written instrument are well established. The interpretation of a contract is a judicial function. [Citations.] In engaging in this function, the trial court 'give[s] effect to the mutual intention of the parties as it existed' at the time the contract was executed. [Citation.] Ordinarily, the objective intent of the contracting parties is a legal question determined solely by reference to the contract's terms. [Citation.]" (*Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1125-1126 (*Wolf*).)

"The court generally may not consider extrinsic evidence of any prior agreement or contemporaneous oral agreement to vary or contradict the clear and unambiguous terms of a written, integrated contract. [Citations.] Extrinsic evidence is admissible, however, to interpret an agreement when a material term is ambiguous. [Citations.]" (*Wolf, supra,* 162 Cal.App.4th at p. 1126; see also *Pacific Gas & Electric Co. v. G.W. Thomas Drayage & Rigging* (1968) 69 Cal.2d 33, 39-40 [if extrinsic evidence reveals that apparently clear language in the contract is, in fact, "susceptible to more than one reasonable

20

interpretation," then extrinsic evidence may be used to determine the contracting parties' objective intent].)

"The interpretation of a contract involves 'a two-step process:  First the court provisionally receives (without actually admitting) all credible evidence concerning the parties' intentions to determine "ambiguity," i.e., whether the language is "reasonably susceptible" to the interpretation urged by a party. If in light of the extrinsic evidence the court decides the language is "reasonably susceptible" to the interpretation urged, the extrinsic evidence is then admitted to aid in the second step – interpreting the contract.  [Citation.]' [Citation.]" (*Wolf v. Superior Court* (2004) 114 Cal.App.4th 1343, 1351 (*Wolf II*) [citing and quoting *Winet v. Price* (1992) 4 Cal.App.4th 1159, 1165 (*Winet*)]; see also *Wolf, supra,* 162 Cal.App.4th at p. 1126.)

"When there is no material conflict in the extrinsic evidence, the trial court interprets the contract as a matter of law.  [Citation.]  This is true even when conflicting inferences may be drawn from the undisputed extrinsic evidence [citations] or that extrinsic evidence renders the contract terms susceptible to more than one reasonable interpretation.  [Citations.]  If, however, there is a conflict in the extrinsic evidence, the factual conflict is to be resolved by the jury.  [Citations.]" (*Wolf, supra,* 162 Cal.App.4th at pp. 1126-1127; see *id.* at p. 1134 ["that extrinsic evidence may reveal an ambiguity subjecting a contract to more than one reasonable interpretation does not mean resolution of that ambiguity is necessarily a jury question. Absent a conflict in the evidence, the interpretation of the contract remains a matter of law"].)

On appeal, a "trial court's ruling on the threshold determination of 'ambiguity' (i.e., whether the proffered evidence

is relevant to prove a meaning to which the language is reasonably susceptible) is a question of law, not of fact. [Citation.]  Thus[,] the threshold determination of ambiguity is subject to independent review.  [Citation.]" (*Winet, supra,* 4 Cal.App.4th at p. 1165)

"The second step – the ultimate construction placed upon the ambiguous language – may call for differing standards of review, depending upon the parol evidence used to construe the contract." (*Winet, supra,* 4 Cal.App.4th at pp. 1165-1166.) However, where no extrinsic evidence was admitted, or the extrinsic evidence is not conflicting, "the appellate court will independently construe the writing." (*Id.* at p. 1166; see also *Department of Forestry & Fire Protection v. Lawrence Livermore National Security, LLC* (2015) 239 Cal.App.4th 1060, 1066 ["On appeal from a summary judgment based on a trial court's interpretation of a contract, we are not bound by that interpretation . . . if there is no extrinsic evidence concerning its interpretation, [or] . . . if there is no conflict in such evidence"].)

### B. The 1972 Agreement is Reasonably Susceptible to Plaintiffs' Interpretation

The first question we must address is whether the 1972 Agreement "is 'reasonably susceptible' to the interpretation urged by [plaintiffs.]  If it is not, the case is over. [Citation.]" (*Southern Cal. Edison Co. v. Superior Court* (1995) 37 Cal.App.4th 839, 847 (*Southern Cal. Edison*).)  After provisionally receiving plaintiffs' extrinsic evidence (except for those portions to which objections were sustained), the trial court concluded that the revenue-sharing provision in paragraph 22 could not be reasonably interpreted to include income FOM had received from performance royalties.  In support, the court relied on language

in paragraph 7 stating that plaintiffs were not entitled to share in any sums FOM had received from a PRO for performance royalties.

We disagree with the trial court's threshold determination. As the plaintiffs note, paragraph 22 of the agreement does not contain any language indicating that performance royalties are to be excluded from "Composition Gross Receipts," which defines the pool of income that is subject to plaintiffs' revenue sharing rights. Instead, paragraph 22 states that Composition Gross Receipts consists of "all monies actually earned and received from the sale, lease, license, disposition or other turning to account of rights in the Compositions. . . ." FOM does not dispute that performance royalties are a form of "money . . . earned" from the sale or license of the compositions that are subject to the 1972 Agreement. Thus, considered in isolation, the language of paragraph 22 supports the plaintiffs' interpretation of the agreement.

FOM contends, and the trial court agreed, that despite the absence of any exclusionary language in paragraph 22, the text of paragraph 7 nonetheless shows the parties intended to exclude performance royalties from paragraph 22's revenue-sharing provision. Paragraph 7 sets forth the "royalties" FOM must pay plaintiffs "with respect to each composition." The paragraph requires FOM to pay a 50 percent royalty for most forms of income generated from the exploitation of the composition, including mechanical rights, synchronization rights and foreign income, but clarifies "that the Writer shall not be entitled to share in any sum or sums received by the Publisher from [any PRO] which pays performance fees directly to songwriters." Paragraph 7(f) then reiterates that FOM shall not be required to pay "royalties earned by reasons of the public performances of the

composition; said royalties being payable only by [the Writer's PRO]."

The language in paragraph 7 does not render plaintiffs' proposed interpretation of the 1972 Agreement unreasonable. Paragraph 7 and paragraph 22 address two distinct types of payments that FOM must pay to plaintiffs:  royalty payments (paragraph 7) and a revenue-sharing payment (paragraph 22). The language in paragraph 7 that precludes plaintiffs from sharing in FOM's "performance income" can be reasonably interpreted as applying only to the type of payment described in paragraph 7, namely royalty payments.  Paragraph 7 does not include any language stating that the exclusion of "performance fees" extends to paragraph 22's revenue-sharing provision. Moreover, the first clause of paragraph 22 directs that the revenue-sharing payment described therein is to be paid "In addition to the royalties provided for in Paragraph 7."  The fact that plaintiffs are not entitled to receive royalty payments on FOM's performance income does not necessarily preclude them from receiving a portion of FOM's performance income based on the revenue-sharing payment described in paragraph 22, which is to be paid "in addition to" whatever royalties are due under paragraph 7.

FOM argues that plaintiffs' proposed interpretation of paragraph 22 would render "paragraph 7's specific exclusion of . . . public performance royalties . . . meaningless."  As explained above, however, under plaintiffs' interpretation, the exclusionary language in paragraph 7 serves to clarify that while FOM must pay plaintiffs a 50 percent royalty on most forms of income, the performance income FOM receives from its PRO is not subject to that requirement.  Paragraph 22, in turn, provides that "in

24

addition to" the royalties described in paragraph 7, plaintiffs are entitled to a certain share (30 percent after various administrative costs and fees are deducted) of "all monies [FOM] actually earned and received" from the sale or licensing of the music compositions. Thus, the language in paragraph 7 and 22 are both given effect: the former provision establishes that FOM does not have to pay plaintiffs a 50 percent royalty on the performance income it receives from its PRO, while the latter provision establishes that such income is nonetheless subject to the revenue-sharing formula set forth in paragraph 22.

Plaintiffs' proposed interpretation is also supported by their extrinsic evidence. First, as explained in Clainos's declaration, prior to signing the 1972 Agreement, the parties entered into a MOA that summarized the terms of what they had agreed to. The MOA expressly states that the signatories agreed that it "reflect[ed]" the terms of the agreement that were to be included in their "formal contract[]." Paragraph 3(b) of the MOA sets forth the royalties FOM agreed to pay plaintiffs, and includes language clarifying that plaintiffs were to obtain "any and all performance moneys" from ASCAP, and not from FOM. Paragraph 3(e) of the MOA sets forth the revenue participation payment, directing that "in addition to the foregoing, the writer shall receive . . . 30% of [FOM's] share of publisher income (after deduction for collection fees, direct costs and administration fees.)" Paragraph 3(e) has no language excluding income that FOM received from performance royalties. Considered together, paragraph 3(b) and 3(e) support plaintiffs' assertion that the parties intended FOM would not be required to pay royalties on performance income, but would nonetheless be required to

include such income when calculating the revenue-sharing payment.

Nicholas Clainos's declaration lends further support to plaintiffs' interpretation. Clainos asserted that during his negotiations of the 1972 Agreement with Steve Gold, then a co-owner of FOM, Gold specifically acknowledged that the parties had agreed the revenue-sharing provision would apply to "100% of all revenue the publisher received, including the publisher's public performance revenue." Clainos further asserted that he and Gold discussed that, as used in paragraph 22, the term "'all monies' in the definition of 'Composition Gross Receipts' . . . encompassed [FOM's] share of public performance revenues that were otherwise excluded in connection with the calculations under paragraph 7."

Michael Perlstein's expert testimony regarding industry usage and custom also provides support for plaintiffs' interpretation. According to Perlstein, at the time the 1972 Agreement was negotiated, it was customary in the music publishing industry that a provision entitling a writer to a share of the publisher's income would include income generated from performance royalties. Indeed, Perlstein noted that in his 50 years of drafting, negotiating and evaluating music publishing agreements, he had never seen a single agreement that contained a revenue sharing provision that excluded performance royalties. This testimony suggests plaintiffs' proposed interpretation accords with the industry customs and practices that were in effect at the time the contract was negotiated.[7]

---

[7]    In its written order, the trial court concluded Perlstein's testimony amounted to his own "legal opinions as to the meaning of paragraph 22," and was therefore not relevant to the

26

Finally, the plaintiffs submitted accounting statements showing that, as recently as 2011 and 2013, FOM had paid plaintiffs a share of the income it derived from performance royalties.[8] These accounting statements provide circumstantial evidence that FOM believed the 1972 Agreement entitled plaintiffs to share in performance royalties, which again accords with plaintiffs' proposed interpretation.  (See *Universal Sales*

interpretation of the contract.  Perlstein, however, did not merely relate his subjective interpretation of paragraph 22.  Rather, he provided expert testimony regarding the music publishing industry's customs and usage pertaining to revenue-sharing provisions such as the one set forth in paragraph 22.  Specifically, Perlstein asserted that such provisions customarily applied to all forms of publisher revenue, including performance royalties the publisher obtains from a public rights organization.  This custom and usage evidence was relevant to aid in the interpretation of the contract.  (See *Howard Entertainment, Inc. v. Kudrow* (2012) 208 Cal.App.4th 1102, 1119-1121 [trial court erred in excluding expert declaration stating that management agreements in the entertainment industry customarily entitled managers to post-termination compensation for any engagements that were entered into while the agreement was in effect]; *Hayter Trucking, Inc. v. Shell Western E&P, Inc.* (1993) 18 Cal.App.4th 1, 20 ["parol evidence of custom and usage is similarly admissible to interpret the written words"].)

[8]     As discussed above (see *ante*, pp. 15-16, 18), plaintiffs' expert in music accounting, Fred Wolinsky, submitted these accounting statements in support of his declaration stating that FOM had paid plaintiffs a share of performance royalties for decades, before suddenly changing course in 2014.  The trial court sustained objections to Wolinsky's "course of performance" testimony, but overruled objections to the actual accounting statements he submitted with the declaration.

*Corp. v. California Press Mfg. Co.* (1942) 20 Cal.2d 751, 761 ["when a contract is ambiguous, a construction given to it by the acts and conduct of the parties with knowledge of its terms, before any controversy has arisen as to its meaning, is entitled to great weight"]; *Enos v. Armstrong* (1946) 75 Cal.App.2d 663, 669 ["where the terms are . . . capable of more than one reasonable construction, the practical construction put upon the instrument by the parties thereto, as evidenced by their conduct under it, furnishes one of the most reliable means of arriving at its meaning and their intention when executing it"].)

In sum, contrary to the trial court's conclusion, the language of the 1972 Agreement, considered in conjunction with plaintiffs' extrinsic evidence, demonstrates that the contract is reasonably susceptible to the plaintiffs' proposed interpretation.

### C. Plaintiffs' Interpretation Is More Reasonable than the Interpretation FOM Has Proposed

Having concluded that the parties' agreement is reasonably susceptible to plaintiffs' proposed interpretation, we move to the "second step – interpreting the contract." (*Wolf II, supra*, 114 Cal.App.4th at p. 1351; see also *Southern Cal. Edison, supra,* 37 Cal.App.4th at pp. 847-848 ["If the court decides the language is reasonably susceptible to the interpretation urged, the court moves to the second question: what did the parties intend the language to mean?"].) Because the parties' summary judgment materials do not contain any conflicting extrinsic evidence (FOM having elected not to submit any extrinsic evidence), we interpret the contract as a "question of law subject to our independent construction." (*Winet, supra*, 4 Cal.App.4th at p. 1160; *Wolf, supra,* 162 Cal.App.4th at p. 1134 ("Absent a conflict in the

28

evidence, the interpretation of the contract remains a matter of law"].)

"'The goal of contractual interpretation is to determine and give effect to the mutual intention of the parties.  [Citations.]' [Citation.]  Thus, 'a "court's paramount consideration . . . is the parties' objective intent when they entered into [the contract]." [Citations.]'  [Citation.]  'A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful.'  [Citation.]  "'If a contract is capable of two constructions courts are bound to give such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect. . . " [Citations.]' [Citation.]" (*Khavarian Enterprises, Inc. v. Commline, Inc.* (2013) 216 Cal.App.4th 310, 318.)  "'In sum, courts must give a '"reasonable and commonsense interpretation"' of a contract consistent with the parties' apparent intent.' [Citation.]" (*Department of Forestry & Fire Protection v. Lawrence Livermore National Security, LLC* (2015) 239 Cal.App.4th 1060, 1066.)

Based on the language of the parties' agreement, and aided by the extrinsic evidence in the record, we conclude that plaintiffs' interpretation of the 1972 Agreement is the most reasonable.  As explained above, paragraph 22 does not include any language indicating that income derived from performance royalties is to be excluded from "Composition Gross Receipts," the base amount used to determine plaintiffs' revenue sharing payment.  Instead, Composition Gross Receipts is specifically defined to include "all monies actually earned and received" in connection with the sale and licensing of the music compositions. Had the parties intended to exclude performance royalties from

29

Composition Gross Receipts, we expect that they would have included language to that effect.

Paragraph 7's exclusion of performance-based income from FOM's royalty payment requirements does not compel a different result. Paragraph 7 describes the royalties FOM is required to pay plaintiffs on various types of income, and expressly excludes royalties on performance-based income. Paragraph 22, in contrast, describes a separate revenue participation payment that is to be paid "in addition to the royalties provided for in Paragraph 7." Unlike paragraph 7, paragraph 22 does not exclude performance royalties from the category of income that is subject to revenue participation. The fact that the parties expressly excluded performance-based revenue from the royalty payments described in paragraph 7, but did not include any such exclusion in paragraph 22, suggests that they intended to include performance royalties in the revenue-sharing provision.

This interpretation is consistent with the plaintiffs' uncontroverted extrinsic evidence, including: (1) Clainos's statements that the FOM representative who negotiated the 1972 Agreement (Steve Gold) specifically acknowledged performance royalties were to be included in Composition Gross Receipts; (2) Perlstein's testimony that it was customary in the music industry for publishers to include performance royalties in a revenue-sharing provision like the one in paragraph 22; and (3) FOM's own statements from 2011 and 2013, which indicate that it had previously paid plaintiffs a share of its performance royalties.

For the purposes of summary judgment, FOM chose not to submit any extrinsic evidence that contradicted or otherwise responded to plaintiffs' extrinsic evidence. Instead, FOM relied solely on the text of the 1972 Agreement, asserting that it

30

unambiguously excluded performance royalties from the revenue-sharing provision described in paragraph 22. For the reasons discussed above, we reject that assertion, and conclude that the text of the 1972 Agreement, interpreted with the aid of the extrinsic evidence currently in the record, shows that the parties intended that performance royalties would be included in paragraph 22's revenue-sharing provision. We therefore reverse the trial court's judgment.

## DISPOSITION

The judgment is reversed. Appellants shall recover their costs on appeal.

ZELON, J.

We concur:

PERLUSS, P. J.

FEUER, J.

31

Filed 4/16/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| HAROLD BROWN, et al., | B278949 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC559691) |
| v. | |
| GERALD GOLDSTEIN, et al. | **ORDER CERTIFIYING OPINION FOR PUBLICATION** |
| Defendants and Respondents. | |

THE COURT:

　　The opinion in this case filed March 27, 2019 was not certified for publication.  On the court's own motion the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

　　IT IS HEREBY ORDERED that the words "Not to be Published in the Official Reports" appearing on page 1 of said opinion be deleted and the opinion be published in the Official Reports.

_____

PERLUSS, P. J.,　　　　　　ZELON, J.,　　　　　　FEUER, J.