Filed 3/3/21  Kidd v. Krave Group CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| MICHAEL KIDD,<br><br>        Plaintiff and Appellant,<br><br>    v.<br><br>KRAVE GROUP, LLC, et al.,<br><br>        Defendants and Respondents. | B299021<br><br>(Los Angeles County<br>Super. Ct. No. BC675143) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Terry A. Green and Cary H. Nishimoto, Judges. Affirmed.

Abir Cohen Treyzon Salo, Boris Treyzon, David S. Bederman and Cynthia A. Goodman for Plaintiff and Appellant.

Arent Fox, Richard D. Buckley, Jr., and George N. Koumbis for Defendants and Respondents.

————————————

Plaintiff Michael Kidd appeals from a judgment entered in favor of defendants Krave Group, LLC (Krave), Charles Aksland, Terry Karges, Wayne Rainey, and Richard Varner[1] after the trial court granted defendants' motion for judgment on the pleadings on the ground the action was barred by the two-year statute of limitations for breach of an oral contract under Code of Civil Procedure section 339, subdivision (1).[2]  Kidd, a motorcycle racing professional, filed suit against defendants in 2017, alleging that in 2014 the Krave defendants breached an agreement to enter into a partnership with him to acquire a motorcycle racing series and to convey to Kidd a percentage of the equity in the venture that later became Krave.

Kidd contends on appeal the partnership agreement was memorialized as a written nondisclosure agreement (NDA) reached in connection with the parties' efforts to acquire the motorcycle racing series, and therefore the four-year statute of limitations applicable to written contracts applies.  Kidd argues the trial court erred in refusing to treat the alleged oral promise to grant Kidd an interest in Krave as parol evidence admissible to construe the NDA, instead finding it constituted a separate oral contract subject to the two-year limitations period.  Kidd also argues defendants are equitably estopped from asserting California's two-year statute of limitations barred his claims because the Krave defendants drafted the NDA with a Connecticut choice-of-law provision.  We affirm.

---

[1]     We refer to the four individual defendants as the "Krave defendants" and all defendants collectively as "defendants."

[2]     All further undesignated statutory references are to the Code of Civil Procedure.

2

# FACTUAL AND PROCEDURAL BACKGROUND

A. *Allegations in the First Amended Complaint*[3]

    1. *Negotiations over acquisition of a motorcycle racing series*

As alleged in the operative first amended complaint, Kidd is a former motorcycle racer who has been involved in motorsports for several decades. He previously worked at the American Motorcyclist Association (AMA) and Daytona Motorsports Group (DMG) as a director and developer of motorcycle races. As a result of his specialized knowledge about the motorcycle racing industry, Kidd became aware that AMA Pro Racing, a series of racing events owned by DMG, was in dire financial straits, and DMG was interested in selling its rights to the racing series. Starting in December 2012, Kidd began searching for business partners to help him finance an acquisition of the series. Because Kidd had a poor relationship with individuals at DMG, he needed a business partner who would act as the public face of the acquisition while Kidd remained a silent partner.

On August 4, 2013 Kidd contacted Aksland, a longtime acquaintance with connections to a motorcycle racing company called Dorna. Kidd told Aksland he wanted to present Dorna with a proposal under which Dorna would finance the purchase of

---

[3] Because we accept the factual allegations of the complaint as true in reviewing a motion for judgment on the pleadings (*York v. City of Los Angeles* (2019) 33 Cal.App.5th 1178, 1193), we do not consider the evidence described in detail by defendants in their respondents' brief (based on evidence presented in connection with their summary judgment motion) because it is outside the pleadings and not relevant to our review.

the rights to the Flat Track & Road Race Series, a division of AMA Pro Racing. Aksland informed Karges, Rainey, and Varner of Kidd's plans, and the four defendants contacted Kidd and told him they and their planned business entity Krave (which they subsequently formed in 2014) were interested in partnering to acquire the rights to the racing series.

On August 7 and 8, 2013 Kidd and the Krave defendants entered into an NDA, drafted by Varner, to protect the parties' confidential information.

2.     *The NDA*

The NDA is attached as an exhibit to the first amended complaint. The preface to the NDA stated the agreement was entered into between "The Group" (defined to mean to Aksland, Karges, Rainey, and Varner) and "KIDDCO" (defined to mean Kidd).

The "Background" section of the NDA described the purpose of the agreement as follows: "The Group and KIDDCO are engaged in discussions regarding possible transactions between KIDDCO and The Group regarding which the parties need to exchange certain information to determine the viability of the possible transactions and whether to continue their discussions regarding the same (collectively herein the "Proposed Transaction")[.] In order to evaluate the Proposed Transaction, KIDDCO and The Group have agreed, subject to the terms of this Agreement, to exchange information concerning their respective businesses, operations and capabilities and certain financial and other information."

Paragraph 1 of the NDA defined "Confidential Information" very broadly to include, among other things, "any information of the disclosing party concerning its business, operations or

4

capabilities or concerning its financial situation or prospects"; "the organization or capital structure, financial performance, business plans or initiatives or strategy of the disclosing party"; any information generally regarded as confidential in the industry or by the disclosing party; and any information that would give the receiving party a competitive advantage.

In paragraph 2, entitled "THE GROUP'S Agreements" (boldface and underscoring omitted), the Krave defendants agreed "the Confidential Information disclosed by KIDDCO to The Group hereunder will be used solely for the purpose of evaluating the Proposed Transaction"; they would not disclose the information to third parties without Kidd's consent; and, "[i]n the event that the Proposed Transaction is not consummated," they would not use the information for any purpose and would destroy the information and any documents based on it. In paragraph 3, Kidd agreed to identical obligations with respect to his handling of confidential information received from the Krave defendants.

In paragraph 4, entitled "ENFORCEMENT" (boldface and underscoring omitted), the parties agreed "that the recovery of damages may be inadequate to compensate the disclosing party in the event of a breach of this Agreement by the receiving party, and accordingly KIDDCO and The Group specifically agree that the disclosing party will have the right to obtain injunctive relief or special performance hereof. Nothing contained in this paragraph, however, will prevent either party from pursuing any remedies in addition to injunctive relief or specific performance, including the recovery of damages." Paragraph 6 provided that unless and until the parties executed and delivered "a final definitive agreement regarding the Proposed Transaction," neither party had any legal obligation to the other party "except

5

for the matters specifically agreed to herein," and all parties agreed they could at any time terminate their discussions without any further obligation.

Paragraph 7.(b) provided the NDA would be "governed by and construed and interpreted" under Connecticut law. Paragraph 7.(c) stated the NDA "expresses the entire agreement between the parties regarding the use and disclosure of Confidential Information and supersedes any prior written or oral understandings or agreements with respect thereto. No representations, oral or written, modifying or contradicting the terms of this Agreement have been made by either party. This Agreement may not be amended, modified or cancelled except by written agreement of the parties."

Finally, Paragraph 7.(e) provided, "Notwithstanding any past, present or future discussions or negotiations, or any past, present or future oral or other commitments, understandings, indications or approvals given by the management or other representative of a party hereto, neither party shall be under any obligation to enter into any future transaction(s). This Agreement merely governs the exchange of Confidential Information between the parties and no other agreement (implied, imputed, actual or otherwise) is intended by this Agreement. Any other agreement(s) shall be set forth in separate documents entered into by and between the parties and neither party shall be bound by the same until such time that the agreements are duly and validly executed and delivered in final form by all parties to be charged thereto."

3. *Varner's oral promise of an ownership interest in Krave*

The first amended complaint alleges that on August 11, 2013 Kidd sent an email to Varner inquiring about Krave's financial status, the number of equity partners, and how the equity would be split among the partners. Kidd and Varner then spoke on the telephone, as follows: "On August 11, 2013, after executing the NDA, [Kidd] and [d]efendant Varner had a telephone call in which [d]efendant Varner offered [Kidd] an ownership interest in [Krave]. Specifically, [d]efendant Varner offered an ownership stake in the entity, valued between 8 percent and 12 percent. [Kidd] countered that he wished for an equity stake closer to 15 percent. The parties agreed after an acquisition that [Kidd] would have an equity stake somewhere between 8 and 15 percent."

On August 14, 2013, "in reliance on the ownership interest promise from [d]efendants," Kidd sent Varner an email containing confidential information that would be material to the acquisition of the rights to AMA Pro Racing, including that AMA held a right of first refusal for any proposed sale by DMG of rights to AMA Pro Racing.

4. *Efforts to acquire AMA Pro Racing*

During August and September 2013 Kidd worked with the Krave defendants to acquire AMA Pro Racing. Kidd contacted the president of AMA and the chairman of its board to win their approval of an acquisition. Kidd also prepared specific directions to guide the Krave defendants' approach as to DMG based on his inside knowledge, and he provided feedback on the Krave defendants' correspondence with DMG. In September 2013 Kidd advised Varner to focus on acquiring the rights to only the Road

7

Race & Flat Track Series because Kidd believed DMG would likely decline an offer for the entire AMA Pro Racing series. Kidd also prepared a business plan for the Road Race & Flat Track Series events, created a staffing plan, drafted due diligence questions, proposed specific racetracks to be added to the series, and provided the Krave defendants with information he had gathered about sponsors who were dissatisfied with DMG's management of the races.

In January 2014 the Krave defendants advised Kidd that they were in active negotiations with DMG. On March 14 Varner advised Kidd that the Krave defendants had made an offer to buy all the rights to AMA Pro Racing rather than just the Road Race & Flat Track Series. On March 15 Aksland informed Kidd DMG had declined the offer. The parties discussed next steps in the wake of DMG's rejection, including an alternative plan to approach AMA about organizing a competing racing series, as well as the possibility of approaching DMG again if AMA Pro Racing's financial performance further deteriorated.

On June 18, 2014 Kidd met with Varner in Varner's office in California. Varner advised Kidd the defendants were close to closing a deal with AMA, and he affirmed the parties had an agreement to make Kidd a part owner of Krave. On August 5 and 27 Varner reiterated that the Krave defendants were close to reaching an agreement with AMA.

On September 3, 2014 AMA announced a deal with Krave in which Krave acquired the rights to the AMA Pro Racing's "Road Race Series," which Krave rebranded as "MotoAmerica." On September 19 Varner sent Kidd an email stating Kidd would not be part of the new deal and would not receive an equity interest in Krave. Varner asserted the parties' partnership agreement governed the acquisition of the rights to the entire

8

AMA Pro Racing series, and the agreement had lapsed after DMG rejected the parties' proposal to buy the entire series in March 2014.

B.    *This Action*

Kidd filed this action on September 7, 2017, alleging causes of action for breach of contract, breach of the covenant of good faith and fair dealing, specific performance, and intentional interference with economic advantage.  Defendants demurred to the complaint, arguing all causes of action were time-barred under section 339's two-year statute of limitations for breach of an oral contract.  Defendants contended the complaint alleged creation of an oral contract during Varner and Kidd's August 11, 2013 call.  Therefore, Kidd's causes of action accrued no later than September 19, 2014 when, as alleged, Varner emailed Kidd to repudiate the agreement, and the action was untimely because it was not filed within two years.  In opposition, Kidd argued Varner's oral promise of an equity interest in Krave was not a separate oral contract, but parol evidence that explained ambiguities in the NDA's remedies provision.  Kidd also argued that based on the Connecticut choice-of-law provision in the NDA, his claims were timely under Connecticut's six-year statute of limitations for breach of contract.[4]  Kidd proposed he could

---

[4]    Under Connecticut law, both an action on a written contract and an implied oral contract on which one party has fully performed are governed by a six-year statute of limitations. (See Conn. Gen. Stat. Ann. § 52-576, subd. (a); *Bagoly v. Riccio* (Conn. App. Ct. 2007) 102 Conn.App. 792, 798-799.)  A three-year statute of limitations applies to an oral contract where neither party has fully performed under the contract.  (Conn. Gen. Stat. Ann. § 52-581, subd. (a); *Bagoly*, at p. 799.)

9

amend the complaint to plead facts showing the parties' contractual intent and establishing defendants' business connections with Connecticut. The trial court[5] sustained the demurrer as to all counts but granted leave to amend as to the causes of action for breach of contract and intentional interference with economic advantage.[6]

Kidd's first amended complaint asserted causes of action for breach of contract and intentional interference with economic advantage. The amended pleading described the parties' contract as follows: "The parties had a written contractual relationship to work *jointly* to acquire the rights to AMA Pro Racing, whether in whole or in part: the preamble to the parties' NDA envisioned that [the parties] would work together by defining the 'Proposed Transaction' as a joint endeavor between the parties." Further, "[d]efendants promised that in exchange for [Kidd's] confidential information, direction, and assistance in consummating the transaction, [Kidd] would receive an ownership stake of between 8 and 15 percent of [Krave]. Defendants further agreed that in the event of a breach of the NDA, they would compensate [Kidd] with 'damages' amounting to an ownership stake of between 8 and 15 percent of [Krave]."

Defendants again demurred, arguing the amended complaint was a sham pleading and Kidd's claims were still barred under the two-year statute of limitations applicable to oral contracts. The trial court overruled the demurrer as to Kidd's

---

[5] Judge Terry A. Green ruled on defendants' demurrers and summary judgment motion.

[6] As to Kidd's claim for specific performance, the trial court held Kidd could plead specific performance as remedy for breach of contract, but not as a separate cause of action.

10

breach of contract cause of action and sustained the demurrer without leave to amend as to the interference with economic advantage cause of action.

On September 28, 2018 defendants moved for summary judgment on the ground they were not contractually obligated to transfer an equity interest in Krave to Kidd.[7] The trial court denied the motion, holding there were triable issues of fact whether the Krave defendants' purchase of a portion of AMA Pro Racing and creation of a competing race series was based on confidential information provided by Kidd under the NDA. The court found the enforcement provisions of the NDA were ambiguous, and parol evidence of an agreement for the Krave defendants to provide at least a 12 percent stake in Krave was admissible to determine whether Kidd could recover in specific performance or damages for loss of the stake. The court explained that Kidd was "permitted to sue for either (a) inclusion in any deal that [the Krave d]efendants make, (b) destruction and non-use of his information, or (c) damages for being excluded from the deal."

In its ruling the trial court determined California law applied to the NDA, which was the position Kidd asserted in his opposition brief (defendants argued Connecticut law applied). The court explained defendants had not presented any facts showing they or the transaction had a substantial relationship with Connecticut. Further, as described in Kidd's statement of additional undisputed material facts in opposition to summary judgment, Varner admitted in his 2018 deposition that the

---

[7]     Defendants did not assert a statute of limitations argument.

11

inclusion of a Connecticut choice-of-law provision in the NDA had been a mistake.

On February 24, 2019 (three weeks before the March 18, 2019 trial date) defendants filed a motion for judgment on the pleadings, which at the court's suggestion they styled as a motion in limine.[8] Defendants argued that under California law, Kidd's cause of action for breach of contract was time-barred because Kidd's claim "is packaged as one for breach of the written NDA, but [Kidd's] prayer for relief is to enforce the alleged oral promise to provide [Kidd] with an ownership interest in [Krave]." At the March 4, 2019 final status conference before Judge Green, Kidd's counsel clarified that Kidd was seeking specific performance of a deal to get 12 to 15 percent of Krave stock, not damages, and therefore the matter would proceed as a bench trial.

On the first day of trial (March 18), the trial court[9] granted defendants' motion for judgment on the pleadings. In its written ruling, the court held Kidd's "breach of contract claim rests on parol[] evidence following the NDA, specifically the oral promise by Varner during a telephone call on [August 11, 2013] that after an acquisition that plaintiff would have an equity stake of somewhere between 8% [and] 15%." The court relied on *Laughlin v. Haberfelde* (1946) 72 Cal.App.2d 780, 785 (*Laughlin*), for the proposition a contract partly in writing and partly oral is an oral contract, and therefore "[p]arol[] evidence (i.e. evidence outside of

---

[8]    Defendants had filed an ex parte application seeking to have their motion for judgment on the pleadings heard before trial. The court denied the motion, but allowed the motion to be heard as a motion in limine on the first day of trial.

[9]    Judge Cary H. Nishimoto presided over the trial, including the motions in limine.

12

the four corners of a fully integrated agreement) . . . is governed by the two[-]year [statute of limitation] for oral contracts . . . ." Because Kidd alleged breach of the agreement on September 19, 2014, the complaint had to be filed no later than September 19, 2016, and the September 7, 2017 filing was untimely.  On May 23, 2019 the court entered judgment in favor of defendants. Kidd timely appealed.

## **DISCUSSION**

A.    *Standard of Review*

"'A judgment on the pleadings in favor of the defendant is appropriate when the complaint fails to allege facts sufficient to state a cause of action.  [Citation.]  A motion for judgment on the pleadings is equivalent to a demurrer and is governed by the same de novo standard of review.'" (*People ex rel. Harris v. Pac Anchor Transportation, Inc.* (2014) 59 Cal.4th 772, 777; accord, *York v. City of Los Angeles* (2019) 33 Cal.App.5th 1178, 1193.) "'"We treat the pleadings as admitting all of the material facts properly pleaded, but not any contentions, deductions or conclusions of fact or law contained therein."'" (*Tarin v. Lind* (2020) 47 Cal.App.5th 395, 403-404; accord, *Burd v. Barkley Court Reporters, Inc*. (2017) 17 Cal.App.5th 1037, 1042.)  "If a judgment on the pleadings is correct on any theory of law applicable to the case, we will affirm it regardless of the considerations used by the superior court to reach its conclusion." (*Bucur v. Ahmad* (2016) 244 Cal.App.4th 175, 185; see *Monsanto Co. v. Office of Environmental Health Hazard Assessment* (2018) 22 Cal.App.5th 534, 544-545 (*Monsanto*).)

B.    *Rules Governing the Interpretation of Written Contracts*

"'The rules governing the role of the court in interpreting a written instrument are well established.  The interpretation of a contract is a judicial function.  [Citation.]  In engaging in this function, the trial court "give[s] effect to the mutual intention of the parties as it existed" at the time the contract was executed.  [Citation.]  Ordinarily, the objective intent of the contracting parties is a legal question determined solely by reference to the contract's terms.'" (*Brown v. Goldstein* (2019) 34 Cal.App.5th 418, 432 (*Brown*), quoting *Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1125-1126 (*Wolf*).)

"Terms set forth in a writing intended by the parties as a final expression of their agreement with respect to the terms included therein may not be contradicted by evidence of a prior agreement or of a contemporaneous oral agreement." (§ 1856, subd. (a); accord, *Brown, supra,* 34 Cal.App.5th at p. 432 ["'The court generally may not consider extrinsic evidence of any prior agreement or contemporaneous oral agreement to vary or contradict the clear and unambiguous terms of a written, integrated contract.'"].)  "'Extrinsic evidence is admissible, however, to interpret an agreement when a material term is ambiguous.'" (*Brown*, at p. 432; see *Pacific Gas & E. Co. v. G.W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 37, 39-40 (*Pacific Gas & E. Co.*) [notwithstanding the plain and unambiguous language on the face of a contract, if extrinsic evidence is "relevant to prove a meaning to which the language of the instrument is reasonably susceptible," the extrinsic evidence may be admitted to determine the contracting parties' objective intent].)

"When the meaning of the words used in a contract is disputed, the trial court engages in a three-step process.  First, it

14

provisionally receives any proffered extrinsic evidence that is relevant to prove a meaning to which the language of the instrument is reasonably susceptible.  [Citations.]  If, in light of the extrinsic evidence, the language is reasonably susceptible to the interpretation urged, the extrinsic evidence is then admitted to aid the court in its role in interpreting the contract.  [Citations.]  When there is no material conflict in the extrinsic evidence, the trial court interprets the contract as a matter of law." (*Wolf, supra*, 162 Cal.App.4th at p. 1126; accord, *Brown, supra*, 34 Cal.App.5th at pp. 432-433; *Winet v. Price* (1992) 4 Cal.App.4th 1159, 1165 (*Winet*).)

On appeal, a "trial court's ruling on the threshold determination of 'ambiguity' (i.e., whether the proffered evidence is relevant to prove a meaning to which the language is reasonably susceptible) is a question of law, not of fact.  [Citation.]  Thus[,] the threshold determination of ambiguity is subject to independent review." (*Winet, supra*, 4 Cal.App.4th at p. 1165; accord, *Brown, supra*, 34 Cal.App.5th at p. 433.)  The "ultimate construction placed upon the ambiguous language . . . may call for differing standards of review, depending upon the parol evidence used to construe the contract." (*Winet*, at pp. 1165-1166; accord, *Brown*, at p. 433.)  Because we accept the allegations of the complaint as true in reviewing the grant of a motion for judgment on the pleadings, the extrinsic evidence is not in conflict.  Therefore, we independently construe the contract. (*Brown*, at p. 433; *Winet*, at p. 1166.)

C.    *The Trial Court Properly Granted Judgment on the Pleadings*

On appeal, Kidd contends the four-year statute of limitations for breach of a written contract (§ 337, subd. (a))

15

rather than the two-year limitations period for breach of an oral agreement (§ 339, subd. (1)) applies to his contract claim because the written NDA "expressly and implicitly created a de facto partnership agreement," allowing Kidd to sue for a percentage in Krave as specific performance of the NDA. (Italics omitted.) Kidd argues his oral agreement with Varner, under which he would receive an equity interest in Krave "between 8 and 15 percent" upon the acquisition of AMA Pro Racing, is parol evidence admissible to interpret the NDA and not, as the trial court found, evidence of an oral contract or modification to the written contract. Kidd's argument is not persuasive.

As part of our analysis, we provisionally receive the parol evidence (the alleged oral promise) and determine if the NDA is "reasonably susceptible" to the interpretation advanced by Kidd. (*Wolf, supra*, 162 Cal.App.4th at p. 1126; accord, *Brown, supra*, 34 Cal.App.5th at pp. 432-433.) Several provisions of the NDA show it cannot reasonably be interpreted in light of the extrinsic evidence as a de facto partnership agreement. The NDA expressly stated the parties agreed to exchange confidential information "[i]n order to evaluate the Proposed Transaction," but "unless and until a final definitive agreement regarding the Proposed Transaction has been executed and delivered, neither party will be under any legal obligation of any kind whatsoever with respect to such a transaction as a result of this Agreement, except for the matters specifically agreed to herein." Further, each party reserved the right to reject proposals made by the other party with respect to the "Proposed Transaction" and to terminate discussions "at any time without any further obligation(s) except as herein provided." And as discussed, the parties explicitly agreed the NDA "merely governs the exchange of Confidential Information between the parties and no other

16

agreement (implied, imputed, actual or otherwise) is intended by this Agreement. Any other agreement(s) shall be set forth in separate documents entered into by and between the parties and neither patty shall be bound by the same until such time that the agreements are duly and validly executed and delivered in final form by all parties to be charged thereto."

On appeal, Kidd argues that because the NDA does not specify the scope of the "Proposed Transaction," and the disclaimers stating the parties had no obligations beyond protection of the confidential information were subject to exceptions for "matters specifically agreed to herein" and "as otherwise provided herein," the scope of the NDA is ambiguous. Thus, Kidd asserts, parol evidence is admissible to support his claim that at the time the parties entered the NDA, they contemplated a joint acquisition of some or all of the AMA Pro Racing series from DMG. This argument fails because even if the parol evidence (the alleged oral promise) clarifies that the "Proposed Transaction" was a partnership to acquire a racing series, this clarification does not transform the NDA from an agreement about the sharing of confidential information to a de facto partnership agreement. Thus, the extrinsic evidence is not admissible because it is not "relevant to prove a meaning to which the language is reasonably susceptible." (*Winet, supra*, 4 Cal.App.4th at p. 1165; see *id.* at p. 1167 [parol evidence inadmissible to construe release of claims where release not reasonably susceptible to proffered meaning]; *Gerdlund v. Electronic Dispensers International* (1987) 190 Cal.App.3d 263, 273 [trial court erred in admitting evidence of employer's oral promises to sales representatives because written agreement was not amenable to proffered meaning].)

17

Kidd also argues the NDA's remedy provisions are ambiguous because the document acknowledges in paragraph 4 that the recovery of damages may be inadequate in case of a breach and therefore provides for recovery of specific performance, but it fails to specify what specific performance the disclosing party would be entitled to recover. Kidd argues parol evidence of Varner's later oral promise clarifies that Kidd was entitled under the NDA to conveyance of an 8 to 15 percent ownership interest in Krave upon the Krave defendants' breach of the NDA by using Kidd's confidential information to consummate a transaction that excluded him. The fallacy in Kidd's argument is that parol evidence showing that three days after executing the NDA Varner offered Kidd an equity interest in Krave in exchange for Kidd providing confidential information material to acquisition of the rights to AMA Pro Racing does not reasonably support an interpretation that the NDA—which clearly stated any agreement other than relating to the exchange of confidential information would need to be in a separate executed document—was a de facto partnership agreement granting Kidd an equity interest in Krave.

Had Kidd pursued a claim for breach of the disclosure provisions of the NDA (instead of breach of a partnership agreement), he could have argued for other specific performance, for example, inclusion of Kidd in the deal defendants negotiated using his confidential information (for MotoAmerica). But Kidd elected to pursue a claim for breach of the NDA as a partnership agreement. Because the NDA is not reasonably susceptible to the interpretation urged by Kidd, the parol evidence is inadmissible, and we do not reach the third step of interpreting the contract. (*Wolf, supra*, 162 Cal.App.4th at p. 1126; see *Brown, supra*, 34 Cal.App.5th at pp. 432-433; *Pacific Gas & E. Co., supra*,

69 Cal.2d at pp. 37, 39-40 [extrinsic evidence may be used to determine the parties' objective intent only if the evidence is "relevant to prove a meaning to which the language of the instrument is reasonably susceptible"].)

It therefore follows that Kidd has alleged a subsequent oral agreement subject to the two-year statute of limitations. The Court of Appeal's holding in *McClain v. Rush* (1989) 216 Cal.App.3d 18, relied on by defendants, is instructive. There, the purchaser of real property sued the sellers for breach of contract and fraud, alleging the water in the well on the property was not potable. (*Id.* at p. 22.) The Court of Appeal affirmed the trial court's grant of defendants' motion for judgment on the pleadings, finding evidence of a promise by the seller as to the quality of the water was inadmissible to interpret the written sales agreement because there was no mention of the well in the integrated agreement—comprised of a deposit receipt agreement and escrow instructions—other than the well's capacity. (*Id.* at pp. 30-31.) Thus, the two-year limitations period applied to any separate oral agreement regarding the quality of the water. (*Id.* at p. 31.) Likewise, because the NDA is an integrated written agreement, and the alleged parol evidence is not admissible to interpret the agreement, the two-year statute of limitations for breach of an oral contract barred Kidd's breach of contract claim.[10]

---

[10] *Laughlin, supra*, 72 Cal.App.2d at page 785, relied on by the trial court, does not inform our decision. In *Laughlin*, the Court of Appeal concluded, "'A contract partly in writing and partly oral is, in legal effect, an oral contract. "It occurs where an incomplete writing, or one expressing only a part of what is meant, is, by oral words, rounded into the full contract".'"

19

D. *Defendants Are Not Equitably Estopped from Asserting Their Statute of Limitations Defense*

Kidd contends defendants are equitably estopped from asserting California's two-year statute of limitations barred his breach of contract claim because the choice-of-law provision of the NDA, which Varner drafted, stated the NDA would be governed by Connecticut law, which provides for a six-year statute of limitations on breach of contract claims. Kidd's attorney first raised his equitable estoppel argument at the hearing on defendants' motion for judgment on the pleadings, arguing Kidd did not know the Connecticut choice-of-law provision in the NDA was a mistake until after he filed his complaint.[11] Kidd's contention lacks merit.

---

*Laughlin* did not involve a statute of limitations issue. Rather, the issue on appeal was only whether the plaintiff had sufficiently alleged the existence of a partnership agreement on terms that were not set forth in a written "preliminary agreement" between the parties. As discussed, the NDA was an integrated agreement concerning the sharing of confidential information. Thus, the later oral agreement to form a partnership was a separate agreement subject to the two-year statute of limitations applicable to oral contracts.

[11] Kidd argued at the hearing that California law should apply to interpretation of the NDA but defendants should be equitably estopped from relying on the California statute of limitations because of their inclusion of the Connecticut choice-of-law provision in the NDA. When the court asked Kidd's attorney what connection the parties had to Connecticut, Kidd's attorney responded, "None." On appeal, Kidd contends he did not know the inclusion of the choice-of-law provision was a mistake until Varner admitted this during his 2018 deposition.

20

"'[A] defendant may be equitably estopped from asserting a statutory or contractual limitations period as a defense if the defendant's act or omission caused the plaintiff to refrain from filing a timely suit and the plaintiff's reliance on the defendant's conduct was reasonable.'" (*Wind Dancer Production Group v. Walt Disney Pictures* (2017) 10 Cal.App.5th 56, 79 (*Wind Dancer*); see *Lantzy v. Centex Homes* (2003) 31 Cal.4th 363, 383 ["""One cannot justly or equitably lull his adversary into a false sense of security, and thereby cause his adversary to subject his claim to the bar of the statute of limitations, and then be permitted to plead the very delay caused by his course of conduct as a defense to the action when brought."""].) "'Generally speaking, four elements must be present in order to apply the doctrine of equitable estoppel: (1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury.'" (*May v. City of Milpitas* (2013) 217 Cal.App.4th 1307, 1338 (*May*), quoting *Driscoll v. City of Los Angeles* (1967) 67 Cal.2d 297, 305.) "The defendant's statement or conduct must amount to a misrepresentation bearing on the necessity of bringing a timely suit; the defendant's mere denial of *legal liability* does not set up an estoppel." (*Lantzy*, at p. 384, fn. 18; accord, *May*, at p. 1338.) """It is not necessary that the defendant acted in bad faith or intended to mislead the plaintiff. [Citations.] It is sufficient that the defendant's conduct in fact induced the plaintiff to refrain from instituting legal proceedings."" (*Wind Dancer*, at p. 79; accord, *Lantzy*, at p. 384.)

"""Estoppel must be pleaded and proved as an affirmative bar to a defense of statute of limitations."" (*May, supra,*

21

217 Cal.App.4th at p. 1337.) "'"[W]hether an estoppel exists—whether the acts, representations or conduct lulled a party into a sense of security preventing him from instituting proceedings before the running of the statute, and whether the party relied thereon to his prejudice—is a question of fact and not of law."'" (*Wind Dancer, supra*, 10 Cal.App.5th at p. 79; accord, *Holdgrafer v. Unocal Corp.* (2008) 160 Cal.App.4th 907, 925.) Because Kidd did not plead facts supporting estoppel, instead first raising the issue at the hearing on the motion of judgment on the pleadings, we construe his argument on appeal as a request to amend the complaint to allege equitable estoppel. (*May*, at p. 1339.)

"Whether a motion for judgment on the pleadings should be granted with or without leave to amend depends on 'whether there is a reasonable possibility that the defect can be cured by amendment . . . .' [Citation.] When a cure is a reasonable possibility, the trial court abuses its discretion by not granting leave to amend and a reviewing court must reverse." (*Mendoza v. Continental Sales Co.* (2006) 140 Cal.App.4th 1395, 1402; see *Monsanto, supra*, 22 Cal.App.5th at p. 545; *Kempton v. City of Los Angeles* (2008) 165 Cal.App.4th 1344, 1348 ["Where a complaint could reasonably be amended to allege a valid cause of action, we must reverse the judgment."].) "'The plaintiff has the burden of proving that [an] amendment would cure the legal defect, and may [even] meet this burden [for the first time] on appeal.'" (*Sierra Palms Homeowners Assn. v. Metro Gold Line Foothill Extension Construction Authority* (2018) 19 Cal.App.5th 1127, 1132; see *Mendoza,* at p. 1402.)

As a threshold matter, even if Kidd could enforce the Connecticut choice-of-law provision based on equitable estoppel, he has not explained why the NDA's choice-of-law provision applied to the subsequent oral agreement. Thus, equitable

estoppel cannot salvage his claim for the Krave defendants' breach of the later oral agreement for an equity stake in the partnership.

Moreover, even if Kidd could show he believed the choice-of-law provision in the NDA applied to the later oral agreement, Kidd has not alleged (or shown that he can allege) that the mistaken inclusion of the Connecticut choice-of-law provision was an act intended to induce Kidd to sit on his rights or that Kidd had a right to believe the inclusion of the provision was intended to delay him from filing suit. (*May, supra*, 217 Cal.App.4th at p. 1338.)[12]  Further, Kidd has not alleged or suggested inclusion of the choice-of-law provision constituted a misrepresentation or that Kidd reasonably relied on the provision. (*May*, at p. 1338.) To the contrary, the parties and their counsel were free to evaluate the choice-of-law provision and to advance legal arguments whether Connecticut or California law controlled disputes arising from the NDA.  It is questionable the Connecticut choice-of-law provision would apply to Kidd's breach

---

[12]    The three estoppel cases cited by Kidd are distinguishable. In *Sumrall v. City of Cypress* (1968) 258 Cal.App.2d 565, 570, the defendant's insurer asked the plaintiff to delay filing a personal injury action to await a medical evaluation the insurer knew would not arrive within the limitations period, and the plaintiff relied on the misrepresentation.  In *Kunstman v. Mirizzi* (1965) 234 Cal.App.2d 753, 756-758, the appellate court rejected the plaintiff's claim his attorney was "lulled into a false sense of security" by ongoing settlement negotiations where the plaintiff failed to allege any affirmative promises made by the defendant insurer as to a settlement by which plaintiff was induced to delay filing her complaint.  *City and County of San Francisco v. Grant Co.* (1986) 181 Cal.App.3d 1085 did not concern equitable estoppel as applied to a statute of limitations defense.

of contract claim given the parties' lack of a connection with Connecticut, as conceded by Kidd's counsel at the hearing. As Kidd alleged in its first amended complaint, Krave is a Delaware limited liability company with its principal place of business in California; the Krave defendants are citizens of the State of California; and Kidd is a citizen of the State of Texas.

Kidd contends on appeal he can allege "facts clarifying the nature of his understanding about the Connecticut statute of limitations." But Kidd's equitable estoppel argument fails principally because he has not alleged defendants engaged in conduct that induced him to refrain from filing suit. Elaboration of Kidd's understanding of the choice-of-law provision in the NDA cannot plausibly satisfy Kidd's burden of alleging he was reasonably induced to refrain from timely suing defendants for an ownership interest in Krave.[13]

---

[13] Kidd also requests leave to amend to allege the NDA's requirement that future business deals be in separate writings was intended to refer only to the Krave defendants' development of a reality television series about motorcycle racing because Kidd did not want the partnership agreement to include the reality television series. But the statement in the NDA that "[a]ny other agreements shall be set forth in separate documents" is not reasonably susceptible to Kidd's construction that only agreements about a reality television series had to be in separate written agreements. And even if Kidd's interpretation were reasonable, it would not turn an agreement about the sharing of confidential information into a partnership agreement.

## DISPOSITION

The judgment is affirmed.  Defendants are to recover their costs on appeal.


FEUER, J.

We concur:


PERLUSS, P. J.


SEGAL, J.